**In re COMMONWEALTH OIL REFINING COMPANY, INC., Debtor.**

**Bankruptcy No. 5–84–01153–E.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

May 17, 1985.

Sander Esserman, Robert Brousseau, Stutzman & Bromberg, Dallas, Tex., for Commonwealth Oil Refining Co., Inc.

John Cermak, Land & Natural Resources Div., Environmental Defense Section, U.S. Dept. of Justice, Washington, D.C., The U.S. Atty., Robert M. Duffy, Asst. U.S. Atty., San Antonio, Tex., for U.S. by and through its E.P.A.

John P. Campbell, Curtis, Mallet-Prevost, Colt & Mosle, New York City, Patrick H. Autry, Matthews & Branscomb, San Antonio, Tex., for Official Committee of Unsecured Creditors.

Clairborne B. Gregory, Jr., Gresham, Davis, Gregory, Worthy & Moore, San Antonio, Tex., for Com. of Puerto Rico.

Patrick H. Autry, Matthews & Branscomb, San Antonio, Tex., John P. Campbell, Curtis, Mallet-Prevost, Colt & Mosle, New York City, for U.S. Trust Co. of New York, Indenture Trustee.

## MEMORANDUM AND ORDER

JOSEPH C. ELLIOTT, Bankruptcy Judge.

Pending before the Court is debtor's motion for an order determining the applicability of the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362(a)(1), to an impending enforcement action by the United States Environmental Protection Agency ("EPA") under section 3008 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6987 (1982). In the alternative, CORCO has moved for an order staying EPA's enforcement action pursuant to 11 U.S.C. § 105. EPA opposes the motion.

After considering the parties' pleadings, affidavits, oral arguments of counsel, and the additional evidence presented at the hearing of April 3, 1985, the Court makes the following findings of fact and conclusions of law:

### I. *Federal Statutory and Regulatory Framework.*

Section 3005 of RCRA, 42 U.S.C. § 6925, requires that facilities which treat, store, or dispose of hazardous waste obtain a permit from EPA or from an authorized State.[1] Such permits are to be issued by EPA only upon a determination that the facility is in compliance with the section 3004 hazardous waste management standards (promulgated by EPA in 40 C.F.R. Part 264) and the section 3005 hazardous waste permit requirements (promulgated by EPA in 40 C.F.R. Part 270). 42 U.S.C. §§ 6924, 6925. Congress recognized, however, that EPA would not be able to issue permits to all hazardous waste management ("HWM") facilities before the permit program became effective. Therefore, section 3005(e), 42 U.S.C. § 6925(e), provides that certain facilities would be treated as having been issued a permit until final administrative action was taken on their permit application. *See generally Hempstead County &*

*Nevada County Project v. EPA*, 700 F.2d 459, 460–62 (8th Cir.1983). A facility obtains this "interim status" if it meets the following three statutory requirements, set out in section 3005(e), 42 U.S.C. § 6925(e): First, that the facility was in existence on November 19, 1980 or is in existence on the effective date of statutory or regulatory changes under RCRA that require the facility to have a permit; second, that the facility complied with the requirements of section 3010(a), 42 U.S.C. § 6930(a), which requires notification of hazardous waste activity; and, third, that the facility filed a permit application which conforms with EPA regulations. Any facility which does not meet these requirements does not have interim status and, if operated without a permit, is in violation of RCRA.

EPA has promulgated regulations setting out the requirements for the permit application which must be filed as a prerequisite to interim status. *See* 40 C.F.R. §§ 270.2, 270.10, 270.70–270.73 (1984). The regulations require that an existing facility first submit Part A of its permit application. *Id.* §§ 270.1, and 270.10(e). The Part A application requires minimal descriptive information such as the location of the facility and processes used in the treatment, storage and disposal of hazardous waste. *Id.* § 270.13. A facility which has interim status can continue to operate without a RCRA permit until EPA acts on the facility's permit application. *Id.* § 270.1(b). The interim status facility must, however, comply with federal regulations and applicable state requirements. 42 U.S.C. § 6929; 40 C.F.R. Part 265, § 270.1(b) (1984).

For these interim status facilities, the actual section 3005(c) permitting process begins with EPA's request for the second part of the permit application, known as Part B. *Id.* §§ 270.1, 270.14. EPA has the authority to call in the Part B at any time.

---

1. Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), allows the Administrator of EPA to authorize a State (including the Commonwealth of Puerto Rico) to operate its own hazardous waste program in lieu of the federal program, providing the State makes certain showings.

*Id.*[2] The facility owner or operator has six months from the date of EPA's request to submit the technical information[3] required by the Part B application. *Id.* § 270.1(b). "Failure to furnish a requested Part B application on time, or to furnish in full the information required by the Part B application, is grounds for termination of interim status under Part 124." 40 C.F.R. § 270.-10(e)(5) (1984). No later than 15 days after termination of interim status, a closure plan must be submitted to the Regional Administrator. *Id.* § 265.112(c).

## II. *Factual Background.*

The debtor, Commonwealth Oil Refining Company ("CORCO"), is the owner and operator of a HWM facility at Penuelas, Puerto Rico. On August 13, 1980, CORCO informed EPA that it conducts activities at the facility involving "hazardous waste," as defined in section 1004(5) of RCRA, 42 U.S.C. § 6903(5) and in 40 C.F.R. § 261.3. On November 18, 1980, CORCO submitted a completed Part A permit application, thereby obtaining interim status.

On October 14, 1982, the Administrator of the EPA authorized Puerto Rico to operate "Phase I" of the hazardous waste program (including regulation of interim status facilities) in lieu of the federal program, pursuant to section 3006(b) of RCRA, 42 U.S.C. § 6926(b). 47 Fed.Reg. 45,880 (Oct. 14, 1982). To implement Phase I, Puerto Rico has promulgated Regulations for the Control of Hazardous and Non-Hazardous Solid Waste pursuant to the Puerto Rico Public Policy Environmental Act, P.R.Laws Ann. tit. 12, § 1121 *et seq.* Although Puerto Rico operates its own program, section 3008 of RCRA, 42 U.S.C. § 6928, authorizes EPA to enforce the provisions of the Commonwealth's program. EPA also operates "Phase II" of the hazardous waste program in Puerto Rico, which includes the authority to issue RCRA permits. 40 C.F.R. § 271.128 (1984).

On April 12, 1984, EPA called in COR-CO's Part B application and set a due date for filing of October 12, 1984. On July 11, 1984, CORCO filed for bankruptcy and on December 13, 1984, CORCO, as debtor-in-possession, moved for an automatic stay or in the alternative a section 105(a) stay of any RCRA enforcement action that has been or will be taken by EPA.

EPA, at this time, intends to file an administrative complaint against CORCO pursuant to RCRA for violations of the Commonwealth of Puerto Rico Public. Policy Environmental Act and sections 3004 and 3005 of RCRA, 42 U.S.C. §§ 6924, 6925, and regulations promulgated under both statutes. The thrust of EPA's enforcement action is that CORCO must either file the Part B permit application or else forfeit interim status and file a closure plan. CORCO does not contend that EPA is wrong on the substantive environmental issues. Rather, it seeks to delay indefinitely the decision on whether to file the Part B or a closure plan.

## III. *Discussion.*

### a. *The Automatic Stay Provision Of The Bankruptcy Code Is Inapplicable To EPA's Enforcement Action*

■ The filing of a bankruptcy petition operates as an automatic stay of any proceeding against the debtor. 11 U.S.C. § 362(a). EPA's potential enforcement action, however, is designed to obtain COR-CO's compliance with hazardous waste, storage and disposal regulations and falls squarely within the exception to the automatic stay codified at 11 U.S.C. § 362(b)(4). That section provides:

---

**2.** Section 213 of the Hazardous Waste Amendments of 1984 amended section 3005(e) of RCRA, 42 U.S.C. § 6925(e), to require submission of the Part B application by a certain date (depending upon the type of facility) if EPA has not already called in the application by that date.

**3.** The Part B application requires information such as how the facility will meet the requirements of 40 C.F.R. Part 264; a general description of the facility; a description of the security procedures at the facility; a copy of the contingency plan to minimize hazards to human health or environment from fires, explosions or unplanned release of hazardous waste; and closure plans. *Id.* § 270.14.

(b) The filing of a petition under section 301, 302, or 303 of this title does not operate as a stay—

. . . . .

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power....

Furthermore, subsection (b)(5) provides that the petition does not stay "the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power."

The intent underlying subsections (b)(4) and (5) is clarified in the legislative history of the Bankruptcy Reform Act of 1978 ("Bankruptcy Code"). Both the Senate and House reports provide as follows:

Paragraph (4) [11 U.S.C. § 362(b)(4)] excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, *where a governmental unit is suing* a debtor *to prevent or stop violation of* fraud, *environmental protection,* consumer protection, safety, *or similar police or regulatory laws,* or *attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.* Paragraph (5) [11 U.S.C. § 362(b)(5)] makes clear that *the exception extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment,* but does not extend to permit enforcement of a money judgment (emphasis added).

S.Rep. No. 989, 95th Cong., 2d Sess. 52, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5838; H.R.Rep. No. 595, 95th Cong., 2d Sess. 343, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5963, 6299.

The House Report to the Bankruptcy Code went on to state that environmental enforcement actions, such as the one at bar, should not be subject to the automatic stay provision:

Under present [pre-Code] law there has been some overuse of the stay in the area of governmental regulation. For example, in one Texas bankruptcy court, the stay was applied to prevent the State of Maine from closing down one of the debtor's plants that was polluting a Maine River in violation of ... [State law.] The bill [the 1978 Code] excepts these kinds of actions from the automatic stay....

H.R.Rep. No. 595, 95th Cong., 2d Sess. 174–75, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6135–36.

The action which EPA is seeking to institute is precisely the type of proceeding Congress intended to exempt from the stay. The RCRA requirements are designed to protect the environment. Congress expressly stated in RCRA that "[t]he objectives of this chapter are to promote the protection of health and environment and to conserve valuable material and energy resources by ... (4) regulating the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on health and the environment...." Section 1003, 42 U.S.C. § 6902.

United States District Judge Dickinson R. Debevoise in the District of New Jersey recently recognized in an unpublished order "that EPA's issuance of administrative orders or initiation of other action pursuant to Section 7003 [of RCRA] ... to protect public health and welfare and the environment also constitutes a valid exercise of the police power of the United States." *In re Bayonne Barrel & Drum Co., Inc.,* No. 82–0474, slip op. at 1 (D.N.J. July 17, 1984). He therefore held EPA's enforcement action under section 3008 to be exempt from the automatic stay. *Id.* The United States District Court for Puerto Rico, where CORCO's facility is located, has also recognized that:

The Bankruptcy Court has no express congressional authority to intervene in environmental matters. Congress did not give the Bankruptcy Court exclusive jurisdiction over *all* controversies that in some way affect the debtor's estate ...

Congress has recently recognized in an express fashion its intention that public interest regulations are to outweigh that of the Bankruptcy Act and Rules in case of conflict.

*Matter of Canarico Quarries, Inc.*, 466 F.Supp. 1333, 1339 (D.P.R.1979) (emphasis in original).

The propriety of EPA's acting to ensure that the conditions at CORCO's facility are remedied was confirmed in *Penn Terra Ltd. v. Dep't of Envt'l. Resources*, 733 F.2d 267 (3d Cir.1984), in which the automatic stay provision of 11 U.S.C. § 362 was determined to be inapplicable to a suit to remedy environmental hazards brought by the Pennsylvania Department of Environmental Resources ("DER"). The Court stated:

> DER seeks to force Penn Terra to rectify harmful environmental hazards. No more obvious exercise of the State's power to protect the health, safety, and welfare of the public can be imagined. Indeed, both the Senate and the House committee reports on the Bankruptcy Reform Act explicitly acknowledge environmental protection as part of the State's police power.

*Id.* at 274.

IV. *The United States Supreme Court's Decision In Ohio v. Kovacs Supports The Government's Attempt To Bring CORCO Into Compliance With The Environmental Laws.*

The United States Supreme Court recently approved of the approach taken by the *Penn Terra* court. In *Ohio v. Kovacs*, —— U.S. ——, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Court stated that the automatic stay provision did not apply to suits to enforce the regulatory statutes of a state. *Id.*, 105 S.Ct. at 711 n. 11. It noted that in *Penn Terra* the State's effort was held to be directed at enforcing an injunction to require compliance with environmental law, not an effort to enforce a money judgment. *Id.* The Court also stated that anyone in possession of the property of the bankrupt estate had to comply with the State's environmental laws. *Id.* at 711–12. *Kovacs* therefore confirms that the automatic stay is inapplicable to EPA's enforcement action.

In *Kovacs*, the Supreme Court addressed whether, under the circumstances of the case before it, an injunction could be a "debt" or "liability on a claim" subject to discharge under the Bankruptcy Code. In that case, the State of Ohio sued Kovacs, the chief executive officer and stockholder of the Chem-Dyne Corporation, and several other business entities, for polluting public waters, maintaining a nuisance and causing fish kills in violation of state environmental laws. In 1979, Kovacs, both on behalf of Chem-Dyne, and in his individual capacity, signed a stipulation and judgment entry settling the action. In addition to prohibiting certain actions, the stipulation required defendants to remove certain wastes from the Chem-Dyne hazardous waste disposal site and ordered the payment of $75,000 in compensation to the State for wildlife injury. *Id.* at 707. Kovacs and the other defendants failed to comply with their obligations under the injunction. The State then obtained the appointment of a receiver, who took possession of the site and began implementing the judgment entry by commencing to clean up the site. Prior to completion of this task, Kovacs filed for personal bankruptcy. *Id.*

In order to develop a basis to require application of part of Kovacs' postbankruptcy income to be applied to the receivership's task, the State filed a motion in State court to discover Kovacs' current income and assets. At Kovacs' request, the Bankruptcy Court stayed those proceedings. The State then filed a complaint in the Bankruptcy Court seeking a declaration that Kovacs' obligation under the stipulation to clean up the Chem-Dyne site was not dischargeable as a "debt" or a liability on a "claim." The complaint also sought an injunction against the bankruptcy trustee to restrain him from pursuing any action to recover Kovacs' assets held by the receiver. Both the Bankruptcy Court and the District Court ruled against the State. The Sixth Circuit affirmed and held that Ohio

was essentially seeking a monetary payment from Kovacs and that such a payment was a liability on a claim, which was dischargeable. *Id.* at 707–08.

The United States Supreme Court agreed with the Sixth Circuit and held that the injunction in question represented an attempt to enforce a money judgment and was therefore a claim pursuant to 11 U.S.C. § 101(4)(B), which was dischargeable. The Court made clear, however, that its decision was limited to the facts of the case. The Court noted that "[a]s we understand it, the Court of Appeals held that, *in the circumstances*, the cleanup duty had been reduced to a monetary obligation" and that *"on the facts before it,* and with the receiver in control of the site, we cannot fault the Court of Appeals for concluding that the cleanup order had been *converted* into an obligation to pay money, an obligation that was dischargeable in bankruptcy." *Id.* at 710–11 (emphasis added).

The Supreme Court made it unequivocally clear that it was the dispossession of Kovacs' assets and the appointment of a receiver that turned the injunction into a dischargeable money obligation. *Id.* at 710–11 & n. 11. The Court noted that Ohio, instead of prosecuting Kovacs under the environmental laws—as EPA intends to do in this case—

> secured the appointment of a receiver, who was ordered to *take possession of Kovacs' nonexempt assets* as well as the assets of the corporate defendants and to comply with the injunction entered against Kovacs ... it *dispossessed* Kovacs, removed his authority over the site, and divested him of assets that might have been used by him to clean up the property. Furthermore, when the bankruptcy trustee sought to recover Kovacs' assets from the receiver, the latter sought an injunction against such action. Although Kovacs had been ordered to "cooperate" with the receiver, he was disabled by the receivership from personally taking charge of and carrying out the removal of wastes from the property. *What the receiver wanted* from Kovacs

after bankruptcy *was the money* to defray cleanup costs. At oral argument ... the State's counsel conceded that after the receiver was appointed, *the only performance sought* from Kovacs *was the payment of money.*

*Id.* at 710 (emphasis added).

The above discussion makes clear that absent divestiture of Kovacs' funds, compliance with the injunction would nonetheless have been required. It was the method utilized by the State to obtain clean-up that the Court found objectionable. This is borne out by the Court's discussion of the Third Circuit's *Penn Terra* decision. *Id.* at 711 n. 11. The Court distinguished *Penn Terra* by pointing out that in that case there was neither the appointment of a receiver, nor was the State seeking money from the bankrupt. *Id.* Yet in *Penn Terra,* the Third Circuit recognized that institution of the injunctive relief might necessitate the expenditure of money:

> Were we to find that any order which requires the expenditure of money is a "money judgment," then the exception to section 362 for government police action, which should be construed broadly, would instead be narrowed into virtual nonexistence. Yet we cannot ignore the fundamental fact that, in contemporary times, almost everything costs something. An injunction which does not compel some expenditure or loss of monies may often be an effective nullity.

733 F.2d at 277–78.

■ The Supreme Court's implied approval of *Penn Terra* makes it apparent that the Supreme Court is not concerned with the expenditure of money by the estate required to bring it into compliance with the environmental laws, but rather with the dispossession of the estate's property by the sovereign in an attempt to carry out an injunction. That this is the proper interpretation of the Court's opinion is borne out by the Court's statement that "we do not suggest that Kovacs' discharge will shield him from prosecution for having violated the environmental laws...." The

Court also emphasized that upon Kovacs' failure to comply with the injunction, an environmental enforcement action or civil or criminal contempt proceedings could have been brought by the State, *id.*, and that anyone in possession of the site had to comply with Ohio's environmental laws. *Id.* 105 S.Ct. at 711–12. "Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such condition. *As this case comes to us,* however, Kovacs has been dispossessed and the State seeks to enforce his cleanup obligation by a money judgment." *Id.* at 712 (emphasis added). It is, of course, impossible to comply with the environmental laws without expending money. The Supreme Court recognized this point and discussed a trustee's options when it is determined that the estate's property is worth either more or less than the cost of bringing it into compliance with the environmental laws. *Id.* at 711 n. 12. The Court specifically refers to the "cost of bringing [the property] into compliance with state law," thereby recognizing that compliance requires the expenditure of money. This further underscores that it is not the bankrupt's duty to spend money to comply with the environmental laws that is dischargeable in bankruptcy, but rather a State's attempt to obtain compliance by enforcing a money judgment.

■ EPA has made it clear that it in no way intends to seek to bring CORCO into compliance with the applicable environmental laws and regulations by dispossessing CORCO of its assets or by seeking compliance via a money judgment. EPA further does not intend to seek either the appointment of a receiver or the execution of a money judgment against CORCO.[4] Rather, EPA is seeking to bring CORCO into compliance with the federal environmental laws and the hazardous waste regulations of the Commonwealth of Puerto Rico. Without submission of the Part B applica-

tion, compliance with interim status requirements, or submission of a closure plan, CORCO will continue to be in violation of the environmental laws. Under *Kovacs,* CORCO may not avoid these requirements. *Id.* at 711–12. Furthermore, as previously noted, *Kovacs* held that the automatic stay provision does not apply to suits to enforce a State's regulatory statutes. *Id.* at 711 n. 11.

## V. *CORCO Is Not Entitled To A Stay Under 11 U.S.C. § 105.*

In the alternative to the automatic stay, CORCO has moved for a stay of proceedings under 11 U.S.C. § 105 to afford it "a reasonable time to reach a management decision, and if it then so chooses, to file a permanent [Part B] Permit Application." CORCO can no longer maintain that it is entitled to a section 105(a) stay.

■ Section 105(a) provides that "the bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Stays under section 105(a) are not, however, routinely granted. The legislative history of the Bankruptcy Code clarifies that section 105(a) stays are only granted "under the usual rules for the issuance of injunction...." S.Rep. No. 989, 95th Cong.2d Sess. 51, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5837; H.R.Rep. 595, 95th Cong., 2d Sess. 342, *reprinted in* 1978 U.S.Code Cong. & Ad.News 6298. One of the four prerequisites in this circuit for the issuance of an injunction is "a substantial likelihood that the movant will prevail on the merits." *Southern Monorail Co. v. Robbins & Myers,* 666 F.2d 185, 186 (5th Cir.1982). Yet CORCO has conceded this element. Specifically, the debtor-in-possession has noted that "CORCO does not assert that the EPA is wrong, or that it is acting in an

**4.** Counsel for EPA has informed the Court that the Agency will not seek the entry of a money

judgment.

arbitrary and capricious manner with respect to the substantive environmental issues...." Moreover, Pedro A. Rios Santiago, vice-president of CORCO, testified that CORCO has filed neither a Part B nor a closure plan and that the facility has not complied with the requirements of the interim status regulations, such as groundwater monitoring. The Court need not therefore address the remaining three elements for a preliminary injunction or address EPA's remaining arguments why a section 105(a) stay should not be granted.[5]

Finally, the Court wishes to note that Congress has expressly directed in 28 U.S.C. § 959(b) that a debtor-in-possession "shall manage and operate the property in his possession ... according to the requirements of the valid laws of the State in which such property is situated...." This provision requires CORCO to comply with federal law. *See, e.g., Haberern v. Lehigh & N.E. Ry. Co.*, 554 F.2d 581 (3d Cir.1977); *Carpenters Local Union No 2746 v. Turney Wood Products, Inc.*, 289 F.Supp. 143 (W.D.Ark.1968). Therefore, there is no obstacle to EPA's enforcement action in this case.

For the foregoing reasons, CORCO's Motion for an Automatic Stay or a Section 105(a) Stay is denied. Moreover, EPA may proceed with its RCRA administrative enforcement action.

---

**5.** EPA also contends that (1) issuance of a § 105(a) stay would render *Kovacs* a nullity, (2) EPA is immune from suit in this Court, (3) the Court lacks jurisdiction to review the merits of EPA's impending enforcement action, because there has been no final agency action, and (4) the applicability of a § 105 stay is not ripe for review.