805 F.2d 1175
 25 ERC 1748, 15 Collier Bankr.Cas.2d 1387,
15 Bankr.Ct.Dec. 688,
Bankr. L. Rep. P 71,542, 17 Envtl. L. Rep. 20,407
 In the Matter of COMMONWEALTH OIL REFINING CO., INC., Debtor.
COMMONWEALTH OIL REFINING COMPANY, INC., et al., Appellants,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Appellee.
In the Matter of COMMONWEALTH OIL REFINING CO., INC., Debtor.
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, et al., Appellants,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Appellee.
 Nos. 85-2827, 85-2828.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 25, 1986.
 
 John P. Campbell, Curtis, Mallet-Prevost, Colt & Mosle, New York City, Matthews & Branscomb, Patrick H. Autry, San Antonio, Tex., for Official Committee.
 Robert T. Brousseau, Sander L. Esserman, Stutzman & Bromberg, Dallas, Tex., for Commonwealth.
 J. Carol Williams, John Cermak, Land & Nat. Resources Div., U.S. Dept. of Justice, Margaret B. Silver, David C. Shilton, Washington, D.C., Carol A. Casazza, U.S. E.P.A., New York City, Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for U.S. E.P.A.
 Appeals from the United States District Court for the Western District of Texas.
 Before GEE, RANDALL and DAVIS, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 Appellants, Commonwealth Oil Refining Company, Inc. (CORCO), the debtor-in-possession, the Committee of Unsecured Creditors, and the Indenture Trustee, appeal from the district court's order affirming the bankruptcy court's decision that the United States Environmental Protection Agency's (EPA) administrative action to bring CORCO into compliance with federal and state environmental laws is exempt from the automatic stay provision of the Bankruptcy Reform Act of 1978 (Bankruptcy Code), 11 U.S.C. Sec. 362(a), and should not be stayed under Sec. 105 of the Bankruptcy Code. We affirm.
 
 I.
 
 2
 This case presents the question of whether a debtor, who has filed a petition under Chapter 11 of the Bankruptcy Code, can be forced to comply with federal and state environmental laws designed to protect the public health and safety, before that debtor has filed its plan of reorganization.
 
 
 3
 Congress enacted the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. Secs. 6901-6991, to regulate the treatment, storage, and disposal of hazardous wastes by monitoring wastes from their creation until their permanent disposal. The objective of the RCRA is "to promote the protection of health and the environment and to conserve valuable material and energy resources." 42 U.S.C. Sec. 6902. Section 3005 of the RCRA, 42 U.S.C. Sec. 6925, requires that facilities which treat, store, or dispose of hazardous waste obtain a permit from the EPA or from an authorized state. Such permits are to be issued only upon a determination that the facility is in compliance with the Sec. 3004 hazardous waste management standards, see 42 U.S.C. Sec. 6924 and 40 C.F.R. Part 264, and the Sec. 3005 hazardous waste permit requirements, see 42 U.S.C. Sec. 6925 and 40 C.F.R. Part 270.
 
 
 4
 Congress recognized that the EPA would not be able to issue permits to all hazardous waste management facilities before the permit program became effective. Therefore, it provided in Sec. 3005(e) of the RCRA, 42 U.S.C. Sec. 6925(e), that certain facilities would be treated as having been issued a permit until final administrative disposition of their permit application could be made. A facility obtains this "interim status" if it meets the following three requirements set out in Sec. 3005: (1) that the facility was in existence on November 19, 1980 or on the effective date of statutory or regulatory changes that render the facility subject to the permit requirement; (2) that the facility has complied with the preliminary notification requirements of RCRA Sec. 3010(a), 42 U.S.C. Sec. 6930(a); and (3) that the facility filed a permit application conforming with EPA regulations.[1]
 
 
 5
 The EPA has promulgated regulations setting out the requirements for the permit application which must be filed as a prerequisite to interim status. See 40 C.F.R. Secs. 270.1-.2, 270.10-.73. The regulations require that an existing facility first submit Part A of its permit application. See 40 C.F.R. Secs. 270.1(b), 270.10(e). Part A requires general descriptive information about the facility, such as its location and the processes the facility uses in the treatment, storage, and disposal of hazardous waste. See 40 C.F.R. Sec. 270.13.
 
 
 6
 For the interim status facilities, the actual permitting process begins when the EPA requests that the facility submit the second part of the permit application, known as "Part B." See 40 C.F.R. Secs. 270.1(b), 270.14. Part B consists of specific information concerning the individual site and the operation of the facility that will indicate compliance with the technical standards and form the basis of the decision to issue or deny the permit and establish site-specific permit conditions. See 40 C.F.R. Sec. 270.14.[2] The EPA has the authority to call in Part B at any time. The facility owner has six months from the date of the EPA's request to submit the technical information required by Part B. 40 C.F.R. Sec. 270.1(b).
 
 
 7
 Failure to furnish the information necessary for final permitting within the time provided is grounds for the termination of interim status. 40 C.F.R. Sec. 270.10(e)(5). Additionally, under the 1984 amendments to the RCRA, each "land disposal facility" operating under interim status prior to November 8, 1984, must submit a Part B permit application and a certification of compliance with all applicable groundwater monitoring and financial responsibility requirements by November 8, 1985, in order to retain interim status after that date. 42 U.S.C. Sec. 6925(e)(2). Facilities that lose their eligibility to operate under interim status must cease acceptance of hazardous waste for treatment, storage, or disposal, and must commence closure activities. See generally 40 C.F.R. Secs. 265.112(c), 265.113. No later than 15 days after a facility loses its interim status, it must submit a closure plan to the Regional Administrator. 40 C.F.R. Sec. 265.112(c).
 
 
 8
 On October 14, 1982, the administrator of the EPA authorized Puerto Rico to operate Phase I of the hazardous waste program in lieu of the federal program, all as contemplated by Sec. 3006(b) of the RCRA, 42 U.S.C. Sec. 6926.[3] To implement Phase I, Puerto Rico has promulgated regulations.[4] Although Puerto Rico operates its own Phase I program, Sec. 3008 of the RCRA, 42 U.S.C. Sec. 6928, authorizes the EPA to enforce the provisions of Puerto Rico's program.
 
 
 9
 On August 13, 1980, CORCO advised the EPA that it conducts activities at the facility involving "hazardous waste," as defined in Sec. 1004(5) of the RCRA, 42 U.S.C. Sec. 6903. On November 18, 1980, CORCO submitted a completed Part A, thereby obtaining interim status. CORCO engaged in its refinery operations until March 3, 1982. Upon ceasing refinery operations, CORCO rented its storage tanks to various industrial companies for storage of fuel oil, gas, and liquified natural gas. On April 12, 1984, the EPA called in CORCO's Part B application and set October 12, 1984, as a deadline for filing. CORCO requested and received an extension to December 7, 1984. On July 11, 1984, CORCO filed a petition under Chapter 11 of the Bankruptcy Code. On December 11, 1984, CORCO informed the EPA that it would not submit its Part B application or a closure plan.
 
 
 10
 The instant law suit began when CORCO filed a motion for an order determining the applicability of the automatic stay provision of the Bankruptcy Code, 11 U.S.C. Sec. 362(a)(1), to an impending enforcement action by the EPA under Sec. 3008 of the RCRA, 42 U.S.C. Sec. 6928. In the alternative, CORCO moved for an order staying the EPA's enforcement action under 11 U.S.C. Sec. 105. The EPA opposed both motions.
 
 
 11
 After a hearing during which CORCO's vice-president acknowledged that CORCO had failed to install a groundwater monitoring system and had not conducted groundwater testing as required by Puerto Rico's regulations, and that CORCO had never filed a Part B application, the bankruptcy court, on May 17, 1985, determined that the EPA's impending enforcement action was not subject to the automatic stay provision of 11 U.S.C. Sec. 362(a)(1) and that no stay should issue under 11 U.S.C. Sec. 105(a) because CORCO had failed to show a likelihood of success on the merits. See 58 B.R. 608 (Bankr.W.D.Tex.1985).
 
 
 12
 On July 1, 1985, the EPA issued an administrative complaint against CORCO, citing it for violations of both the RCRA and the PRPPEA, and the regulations promulgated under both statutes. Among those violations cited were CORCO's failure to submit Part B or a closure plan and its failure to install, operate, and maintain a groundwater monitoring system and groundwater sampling and analysis. The EPA issued a compliance order against CORCO providing as follows: (1) that CORCO shall within ninety days from the date of the complaint make a decision to file either a closure plan within thirty calendar days from decision or a Part B permit application by November 8, 1985; and (2) that CORCO shall within thirty days from the date of the complaint cease to act as a treatment, storage, and disposal facility, unless CORCO elects to file a Part B permit application and complies with certain provisions of Puerto Rico's regulations.
 
 
 13
 The EPA then moved for leave to file an amended administrative complaint to reflect that CORCO had lost its interim status as of November 8, 1985, by operation of the 1984 amendment to the RCRA, 42 U.S.C. Sec. 6925(e)(2). Leave to file the amended administrative complaint was granted. The amended complaint alleged the same basic factual allegations as those alleged in the original administrative complaint, but added a cause of action. The amended complaint alleges that CORCO is in violation of Sec. 3005(e)(2) of the RCRA, 42 U.S.C. Sec. 6925(e)(2). The EPA issued a new compliance order, providing as follows: (1) that CORCO shall henceforth not treat, store, or dispose of any hazardous waste without first having obtained a permit from the EPA; (2) that CORCO shall have thirty days to submit a closure plan for its land disposal facilities and slop oil tank pursuant to the requirements of 40 C.F.R. Sec. 266.112; and (3) that CORCO shall have thirty days to submit a post-closure plan for its land disposal facilities pursuant to the requirements of 40 C.F.R. Sec. 266.118.
 
 
 14
 The district court, in its November 5, 1985 opinion, affirmed the bankruptcy court's decision, noting that it occurred to the court that the entire appeal may be moot by virtue of the automatic termination provision of 42 U.S.C. Sec. 6925(e)(2). The district court found that since CORCO did place hazardous waste in a surface impoundment, its plant in Puerto Rico is a land disposal facility. The court noted that regardless of the outcome of the appeal, the debtor would, by congressional mandate, lose its interim status on November 8, 1985 (just three days from the date of the opinion), unless it complied with the conditions set out in Sec. 6925. The court considered it "most likely" that CORCO would not or could not comply.
 
 
 15
 The district court affirmed the bankruptcy court's holding that the EPA's enforcement action was not stayed by the automatic stay provision of the Bankruptcy Code. The court also affirmed the bankruptcy court's holding that CORCO had failed to establish the prerequisites necessary for a stay under Sec. 105. The court stated that CORCO had conceded that it could not prevail on the merits, and noted that the automatic loss of interim status on November 8, 1985, also precluded success on the merits. Finally, the court noted that an injunction restraining enforcement of the environmental laws would disturb the public interest.
 
 
 16
 This appeal followed.
 
 II.
 
 17
 We must first address the question raised, but not decided, by the district court, of whether this case is moot by virtue of the 1984 amendment to the RCRA, 42 U.S.C. Sec. 6925(e)(2), which established November 8, 1985, as the date on which the interim status of a land disposal facility would terminate if the facility had not filed Part B and the required certifications of compliance with applicable groundwater monitoring and financial responsibility requirements. Raising the mootness question, the district court noted:
 
 
 18
 It occurs to the Court that the entire appeal may be moot. The only issue is whether the EPA can force the debtor to file a Plan B or lose interim status and file a closure plan on its hazardous waste facility in Puerto Rico. Section 6925(e)(2) of Title 42 of the United States Code provides that the interim status of a land disposal facility shall terminate automatically on November 8, 1985 unless the owner or operator applies for a final determination regarding the issuance of a permit and certifies that such facility is in compliance with all applicable groundwater monitoring requirements. Since debtor did place hazardous waste in a surface impoundment ... its plant in Puerto Rico is a land disposal facility. Title 11 U.S.C. Section 6924(k). Debtor has conceded it has not filed its Plan B and has not instituted a groundwater monitoring system.... It appears that regardless of the outcome of this appeal, debtor will, by Congressional mandate, lose its interim status on November 8th unless it complies with the above conditions, which it most likely will not or cannot do.
 
 
 19
 Commonwealth Oil Refining Co., Inc. v. United States Environmental Protection Agency, No. SA-85-CA-2044, slip op. at 2 (W.D.Tex. Nov. 5, 1985) [hereinafter cited as Slip op.]. However, the court did not resolve the mootness question, but rather, went on to decide that "[i]n any event, this Court finds, for the reasons set forth in [the bankruptcy court's] opinion, that EPA's enforcement action should not be restrained." Id.
 
 
 20
 Since the mootness question "strike[s] at the very heart of federal subject matter jurisdiction," decision of that question cannot be avoided. Sannon v. United States, 631 F.2d 1247, 1250 (5th Cir.1980). We must, then, as a threshold matter, determine whether this litigation presents a "case or controversy" within the meaning of Article III of the Constitution.
 
 
 21
 To present a justiciable "controversy" within Article III, the dispute in question
 
 
 22
 must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.... Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised....
 
 
 23
 Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted). Mootness is one of the doctrines derived from the essential adversarial requirement expressed in Article III. "If a dispute has been settled or resolved, or if it has evanesced because of changed circumstances, including the passage of time, it is considered moot." In re S.L.E., Inc., 674 F.2d 359, 364 (5th Cir.1982). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," but, "[w]here one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." Powell v. McCormack, 395 U.S. 486, 496-97, 89 S.Ct. 1944, 1950-51, 23 L.Ed.2d 491 (1969). A case is not moot so long as any claim for relief remains viable, whether that claim was the primary or secondary relief originally sought. Id. at 496 & n. 8, 499-500, 89 S.Ct. at 1950 & n. 8, 1952-53.
 
 
 24
 The district court decided that CORCO is a land disposal facility so that its interim status terminated, by operation of law, on November 8, 1985. Whether the district court was correct in its conclusion, or indeed, whether it had before it a sufficient record on which to base such a determination, are not questions that we must resolve to determine whether this case is moot. There is an administrative proceeding underway in New York to resolve the question of whether CORCO is a "land disposal facility" within 42 U.S.C. Sec. 6925(e)(2), such that its interim status terminated on November 8, 1985. We do not want, or need, to prejudge that question. Rather, to determine whether this case is moot, we will simply ask whether, assuming arguendo that CORCO's interim status did terminate on November 8, 1985, there remain viable claims for relief. Finding that viable claims remain even if the interim status has terminated, we conclude that we have subject-matter jurisdiction over this case.
 
 
 25
 Even if CORCO lost its interim status by operation of law on November 8, 1985, a court could, at the very least, stay the EPA's ongoing enforcement action which seeks to require CORCO to comply with its closure and post-closure obligations. See 40 C.F.R. Part 265. Under the RCRA regulations, a facility must, within fifteen days, submit a closure plan for hazardous waste management units no longer operating under interim status, 40 C.F.R. Sec. 265.112, and must complete closure within 180 days of the final receipt of hazardous wastes or the approval of the closure plan. 40 C.F.R. Sec. 265.113.
 
 
 26
 While CORCO apparently sought a stay for the purpose of preserving its interim status--a status that may now have terminated by operation of 42 U.S.C. Sec. 6925(e)(2)--its motion for stay is much broader. CORCO sought an order "staying any enforcement or revocation proceeding" and requested that the bankruptcy court enter an order "staying enforcement proceeding [sic] against CORCO by the EPA under the Resource Conservation and Recovery Act." (emphasis added). In light of the broad nature of CORCO's motion and the ongoing EPA enforcement action against CORCO, a real controversy between the parties remains. Consequently, this case is not moot. It is clear that there remain live issues between the parties in this case. The fact that a stay of these proceedings might not have the potential for preserving CORCO's interim status does not end the controversy or deprive the parties of their legally cognizable interests in the dispute. Therefore, we now address the substantive issues presented in this case.
 
 III.
 
 27
 Appellants contend that the district court erred in affirming the bankruptcy court's holding that the automatic stay provision of the Bankruptcy Code, 11 U.S.C. Sec. 362(a)(1), did not apply to the EPA's actions in this case. Appellants do not appear to dispute that the EPA's administrative action is directed at bringing CORCO into compliance with state and federal environmental laws. Rather, they contend that the EPA's action is merely one to correct "technical violations" and that a present ongoing threat of "imminent and identifiable harm" to safety and health or "urgent public necessity" is required before the governmental regulation exception to the automatic stay may be invoked. In support of the argument that the exception is limited to those situations where there is imminent and identifiable harm, CORCO cites Midlantic Nat. Bank v. New Jersey Dept. of Envtl. Protection, --- U.S. ----, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). In Midlantic, the Supreme Court held that there was a limited exception to the trustee's abandonment power created under 11 U.S.C. Sec. 554(a) for those cases where abandonment would thwart "laws or regulations ... reasonably calculated to protect the public health or safety from imminent and identifiable harm." 106 S.Ct. at 762-63 n. 9. Additionally, to bolster its argument, CORCO cites portions of the legislative history of the government regulation exception. CORCO contends that no pollution is taking place because the refinery is shut down, and thus, that no imminent and identifiable harm exists. Further, appellants argue that since CORCO would be forced to expend funds in order to comply, the EPA's administrative action is one to enforce a money judgment and is therefore stayed by virtue of 11 U.S.C. Secs. 362(a)(2) and 362(b)(5).[5]
 
 A.
 
 28
 The automatic stay provision of the Bankruptcy Code provides, in relevant part, that the filing of a petition in bankruptcy operates as a stay of "the commencement or continuation ... of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. Sec. 362(a)(1). The purpose of the automatic stay is to give the debtor a "breathing spell" from his creditors, and also, to protect creditors by preventing a race for the debtor's assets. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6296-97 [hereinafter cited as House Report ]. The automatic stay provision is not, however, absolute. Congress set forth, in 11 U.S.C. Sec. 362(b), several exceptions to the automatic stay. Relevant to this case are 11 U.S.C. Secs. 362(b)(4) and 362(b)(5).
 
 
 29
 Section 362(b)(4) provides that the filing of a petition in bankruptcy does not operate as a stay "of the commencement or continuation of an action or proceeding by a governmental unit to enforce [its] police or regulatory power." The purpose of this exception to the automatic stay is explained in the legislative history:
 
 
 30
 Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.
 
 
 31
 S.Rep. No. 989, 95th Cong., 2d Sess. 52 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5838 [hereinafter cited as Senate Report ]; House Report, supra, at 343, U.S.Code Cong. & Admin.News 1978, p. 6298.
 
 
 32
 Section 362(b)(5) provides that the filing of a bankruptcy petition does not operate as a stay "of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power." While expressly excepting from the automatic stay certain judgments obtained in actions to enforce police or regulatory powers, Sec. 362(b)(5) creates an " 'exception to the exception,' [from the automatic stay] in that actions to enforce money judgments are affected by the automatic stay, even if they otherwise were in furtherance" of police and regulatory powers. Penn Terra Ltd. v. Dept. of Envtl. Resources, 733 F.2d 267, 272 (3d Cir.1984) (emphasis in original). As the legislative history explains:
 
 
 33
 Paragraph (5) makes clear that the exception extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment. Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.
 
 
 34
 Senate Report, supra, at 52, U.S.Code Cong. & Admin.News 1978, at 5838; House Report, supra, at 343.
 
 
 35
 The bankruptcy court found that Sec. 362(a)(1) was inapplicable to the EPA's impending enforcement action against CORCO. The court reasoned that the intent underlying both Secs. 362(b)(4) and 362(b)(5) is to permit a governmental unit that is suing a debtor to prevent or stop a violation of environmental protection laws to continue, and that the action which the EPA was seeking to institute was clearly an action that Congress intended to exempt from the automatic stay:
 
 
 36
 The action which EPA is seeking to institute is precisely the type of proceeding Congress intended to exempt from the stay. The RCRA requirements are designed to protect the environment. Congress expressly stated in RCRA that "[t]he objectives of this chapter are to promote the protection of health and environment and to conserve valuable material and energy resources by ... (4) regulating the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on health and the environment...." Section 1003, 42 U.S.C. Sec. 6902.
 
 
 37
 58 B.R. at 612. Further, the court found that, notwithstanding the fact that CORCO would be forced to expend funds to comply, the EPA's actions were exempt from the automatic stay. Id. at 613-15.
 
 
 38
 The district court, affirming the bankruptcy court's decision, found that "[t]he attempt to require debtor to comply with the permit requirements or lose interim status is a legitimate exercise of the government's regulatory power," Slip op. at 2, and went on to say that "[t]he incidental expense which debtor will incur to comply with environmental laws does not convert the action into an enforcement of a money judgment, which would be automatically stayed." Id. at 3.
 
 
 39
 We agree with the conclusion of the bankruptcy court and the district court that the automatic stay does not apply to the EPA's actions in this case. The EPA has the authority to enforce its regulatory power, that is, to require CORCO to comply with the federal and state environmental laws and regulations at issue in this case. The enforcement actions of the EPA in this case do not come within the ambit of Sec. 362(a)(1) because they are actions to enforce police and regulatory powers, thus falling within the Sec. 362(b)(4) exception to the automatic stay. The EPA's actions are not an attempt to enforce a money judgment, proscribed by Sec. 362(b)(5), notwithstanding the fact that CORCO will be forced to expend funds in order to comply.
 
 B.
 
 40
 The exception from the automatic stay for proceedings to enforce police and regulatory powers is not, as appellants suggest, limited to those situations where "imminent and identifiable harm" to the public health and safety or "urgent public necessity" is shown. The words of Secs. 362(b)(4) and 362(b)(5) allow for no such reading. The language of these exceptions is unambiguous--it does not limit the exercise of police or regulatory powers to instances where there can be shown imminent and identifiable harm or urgent public necessity. Where the language of a statute is unambiguous, in the absence of " 'clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' " North Dakota v. United States, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983) (quoting Consumer Product Safety Comm. v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). In this case, the legislative history of the statutory provisions does not call into question our reading of Secs. 362(b)(4) and 362(b)(5) as exempting from the automatic stay, without a showing of imminent harm or urgent public necessity,[6] exercises of police and regulatory powers.[7]
 
 
 41
 Case law supports our conclusion that the police and regulatory exceptions do not depend on a showing of imminent and identifiable harm or urgent public necessity and that the EPA's actions in this case are exempt from the automatic stay. For example, in Penn Terra, the Third Circuit found that the exception to the automatic stay in Secs. 362(b)(4) and 362(b)(5) should be construed broadly so as not to override state laws enacted to protect some public interest.[8] 733 F.2d at 273. The Penn Terracourt found that the state's action to compel Penn Terra to correct violations of anti-pollution laws was exempt from the automatic stay. These violations consisted, in part, of a failure to maintain adequate erosion and sedimentation controls, failure to seal a deep mine pit, and failure to treat mine drainage properly. See 733 F.2d at 269 n. 2.
 
 
 42
 The Supreme Court, in Ohio v. Kovacs, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), noted the Penn Terra decision in the context of recognizing that "[t]he automatic stay provision does not apply to suits to enforce the regulatory statutes of the State." 469 U.S. at 283-84 n. 11, 105 S.Ct. at 711 n. 11. The Court accepted the result of Penn Terra in cases where the governmental action is one to enforce regulatory statutes, as opposed to one to enforce a money judgment. Id. Neither Penn Terra nor the other cases in which a regulatory or police action was found to be exempt from the automatic stay depended on a determination that there was imminent danger to the public.[9] Contrary to what appellants suggest, the fact that "imminent and identifiable harm" can be shown in cases where the regulatory exception was found to apply does not form the basis for reading such a requirement into the exceptions.
 
 
 43
 Appellants' reliance on the Supreme Court's recent decision in Midlantic is misplaced. Midlantic presented the question of "whether Sec. 554(a) of the Bankruptcy Code 11 U.S.C. Sec. 554(a), authorizes a trustee in bankruptcy to abandon property in contravention of state laws or regulations that are reasonably designed to protect the public's health or safety." 106 S.Ct. at 757 (citation omitted). In Midlantic, the Court recognized an exception to the power of a trustee to abandon property, but limited that exception to those instances in which abandonment would violate laws or regulations "reasonably calculated to protect the public health or safety from imminent and identifiable harm." Id. at 762-63 n. 9.
 
 
 44
 In concluding that Midlantic does not support appellants' argument that the Secs. 362(b)(4) and 362(b)(5) exceptions to the automatic stay cannot be invoked absent imminent and identifiable harm, we note several things. First, the question before the Court in Midlantic was the scope of the abandonment power, and it is that power that the Court found to be limited by the "imminent and identifiable harm" standard. Second, notwithstanding the fact that the Court found that pre-Code case law had established limitations on the trustee's abandonment power, see 106 S.Ct. at 759-60, it must be recognized that the abandonment power of Sec. 554 is unqualified on its face.[10] By contrast, the automatic stay was expressly qualified by Congress--11 U.S.C. Sec. 362(b)(4) specifically excludes the exercise of regulatory and police powers from the automatic stay. Moreover, the Supreme Court itself characterized the automatic stay provision as designed to overrule judicial expansion of the automatic stay that was "foreclos[ing] States' efforts to enforce their antipollution laws." 106 S.Ct. at 761. Nowhere did the Supreme Court suggest that the exception in 11 U.S.C. Sec. 362(b)(4) applies only if there is imminent and identifiable harm to the public health or safety.
 
 
 45
 The EPA's enforcement action in this case is an attempt to bring CORCO into compliance with state and federal environmental laws and "falls squarely within the [government's] police and regulatory powers.... No more obvious exercise of the [government's] power to protect the health, safety, and welfare of the public can be imagined." Penn Terra, 733 F.2d at 274. As such, we find that it falls squarely within the Sec. 362(b)(4) police and regulatory exception to the automatic stay.[11]
 
 C.
 
 46
 We must reject appellants' argument that the EPA's enforcement action in this case is an attempt to enforce a money judgment, thus proscribed under Sec. 362(b)(5), since either the filing of a Part B application or the filing of a closure plan and commencement of closure activities would require CORCO to expend funds. This cannot be the test for determining whether a governmental unit seeks to enforce a money judgment, such that its enforcement actions fall within the Sec. 362(b)(5) "exception to the exception" to the automatic stay. As the Third Circuit has observed, "[w]ere we to find that any order which requires the expenditure of money is a 'money judgment,' then the exception to section 362 for government police action ... would ... be narrowed into virtual nonexistence.... [W]e cannot ignore the fundamental fact that, in contemporary times, almost everything costs something." Penn Terra, 733 F.2d at 277-78.
 
 
 47
 Congress did not define the phrase "enforcement of a money judgment" in Sec. 362(b)(5), so, as the court in Penn Terra noted, "[i]ts meaning must ... be gleaned from the commonly accepted usage and from whatever indications of congressional intent we find persuasive.... [W]e must look to legal custom and practice to determine what was traditionally understood to be a recovery for money damages." Penn Terra, 733 F.2d at 274-75 (emphasis in original). As traditionally understood, a money judgment "need consist of only two elements: (1) an identification of the parties for and against whom judgment is being entered, and (2) a definite and certain designation of the amount which plaintiff is owed by defendant. It need not, and generally does not, contain provisions for its enforcement."[12] Id. at 275 (emphasis in original).
 
 
 48
 Just as the Third Circuit found in Penn Terra with respect to proceedings initiated by Pennsylvania's Department of Environmental Resources, we find that, at least as a matter of form, the EPA's action is not a proceeding to enforce a money judgment as that term is traditionally understood. Furthermore, the EPA's action which is clearly not, in form, an action to enforce a money judgment, is also not, in substance, an action to enforce a money judgment. Since we agree with the Third Circuit that the legislative intent underlying Sec. 362(b)(5) should not be undermined "by artful pleading that depends on form rather than substance," 733 F.2d at 275, we must look beyond form to substance to determine whether the EPA's action in reality sought to achieve what a money judgment was traditionally meant to achieve and no more.
 
 
 49
 The Penn Terra court explicitly rejected the notion that simply because an injunction action will require the debtor to expend funds, that action is, in actuality, one to enforce a money judgment.[13] 733 F.2d at 277-78. In rejecting that notion, the court recognized that "in contemporary times, almost everything costs something," id. at 278, and commented that "[a]n injunction which does not compel some expenditure or loss of monies may often be an effective nullity."[14] Id. (citations omitted). The Third Circuit proposed that a better approach for a court to take to determine whether an injunction action is, in application, a money judgment suit, is to focus "on the nature of the injuries which the challenged remedy is intended to redress--including whether plaintiff seeks compensation for past damages or prevention of future harm." Id.; see Cournoyer v. Town of Lincoln, 790 F.2d 971, 976 (1st Cir.1986); ILCO, 48 B.R. at 1024.
 
 
 50
 Utilizing this approach, we conclude that the EPA's administrative action is not, in form or in substance, an action to enforce a money judgment proscribed by Sec. 362(b)(5). The action is one to compel compliance with federal and state environmental laws. The action does not seek the entry of a money judgment or the adjudication of liability for a sum certain. Further, mere payment of money, even if it could be estimated, would not satisfy the EPA's requests.[15] Finally, the EPA's action cannot be seen as an attempt to obtain compensation for past damage. Therefore, the EPA's enforcement action requiring CORCO to comply with federal and state environmental laws is a proper exercise of its regulatory power and is not an attempt to enforce a money judgment. It is exempt from the automatic stay by virtue of Secs. 362(b)(4) and 362(b)(5).
 
 IV.
 
 51
 We turn now to the question of whether, under the facts of this case, the bankruptcy court abused its discretion in refusing to issue a stay of EPA proceedings under 11 U.S.C. Sec. 105. Section 105(a) provides, in relevant part, that "[t]he bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. Sec. 105(a). Assuming that a Sec. 105 stay is available to stay an action expressly exempted by Congress from the operation of the automatic stay provision,[16] we find that the bankruptcy court did not abuse its discretion in refusing to issue a stay under Sec. 105 in this case.
 
 
 52
 The bankruptcy court noted that the legislative history of Sec. 105 makes clear that stays under that section are granted only "under the usual rules for the issuance of an injunction." Senate Report, supra, at 51; House Report, supra, at 342; see In re Cournoyer, 43 B.R. 354 (Bankr.D.R.I.1984), aff'd in part, rev'd in part, 53 B.R. 478 (D.R.I.1985), aff'd, 790 F.2d 971 (1st Cir.1986). The four prerequisites to the issuance of a preliminary injunction are: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and (4) that the granting of the injunction will not disserve the public interest. See Southern Monorail Co. v. Robbins & Myers, Inc., 666 F.2d 185, 186 (5th Cir.1982).
 
 
 53
 The bankruptcy court found that CORCO had conceded the first requirement, stating that, "[s]pecifically, the debtor-in-possession has noted that 'CORCO does not assert that the EPA is wrong, or that it is acting in an arbitrary and capricious manner with respect to the substantive environmental issues....' " 58 B.R. at 615-16. The bankruptcy court also noted the testimony of CORCO's vice-president who had acknowledged "that CORCO has filed neither a Part B nor a closure plan and that the facility has not complied with the requirements of the interim status regulations, such as groundwater monitoring." Id. at 616. Therefore, the bankruptcy court concluded that it was unnecessary to address the other three prerequisites for the issuance of a preliminary injunction.
 
 
 54
 The district court agreed with the bankruptcy court's conclusion that CORCO had failed to establish the prerequisites for a Sec. 105 stay, since "[t]hey concede they cannot prevail on the merits by their admissions that no Plan B has been filed and no groundwater monitoring system exists."[17] Slip op. at 3.
 
 
 55
 Appellants argue that both the bankruptcy court and the district court misapprehended what the "merits" would be for purposes of assessing whether there was a substantial likelihood that CORCO would prevail on the merits. According to appellants, the courts below erroneously viewed the merits to be whether CORCO had complied with the EPA, that is, whether CORCO would be likely to succeed in the underlying enforcement action.[18] In appellants' view, the merits are, instead, whether CORCO must now comply with the federal and state environmental laws, or whether it can later comply as part of a reorganization plan.
 
 
 56
 We believe that the bankruptcy and district courts correctly identified the "merits" for purposes of assessing the propriety of the issuance of a Sec. 105 stay. See In re Cournoyer, 43 B.R. at 360. The inquiry for a preliminary injunction necessarily focuses on the outcome of a later proceeding, at which time the merits of the questions giving rise to the litigation will be decided. CORCO's characterization of the "merits" for purposes of the preliminary injunction analysis erroneously substitutes the question before the court at the preliminary injunction hearing for the merits of the case that must be ultimately decided.
 
 
 57
 Since we believe that the bankruptcy court and the district court correctly identified the "merits," and because we believe that the finding that CORCO was not likely to succeed on the merits was not erroneous,[19] we need not address the remaining requirements for a Sec. 105 stay.[20] We briefly note, however, that a balancing of the harms in this case seems to weigh in favor of the EPA. Enforcement of the environmental laws is in the public interest. While we do not decide today that there will never be a case where a court should issue a Sec. 105 stay to stop proceedings that are exempted from the automatic stay under Secs. 362(b)(4) or 362(b)(5), we do believe that this clearly is not such a case. After two petitions for bankruptcy protection, numerous extensions of the exclusivity period in the current reorganization, and no reorganization plan yet filed, CORCO is in no position to argue that it is "equitably" entitled to more time to comply with the EPA's requirements. The time has come for CORCO to comply.
 
 V.
 
 58
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Facilities with interim status must comply with interim status standards set forth at 40 C.F.R. Part 265 or with the analogous provisions of an authorized state program. Interim status facilities "are not relieved from complying with other state requirements." 40 C.F.R. Sec. 270.1(b)
 
 
 [2]
 Part B consists of general information and specific technical information, including design drawings, engineering studies certified by a registered professional engineer, chemical and physical analyses, and contingency and closure plans. See 40 C.F.R. Secs. 270.14-.29
 
 
 [3]
 The EPA may authorize a state to operate its own hazardous waste program in lieu of the federal program. On October 14, 1982, the EPA authorized Puerto Rico to operate Phase I of the hazardous waste program. 47 Fed.Reg. 45880. Phase I allows states to administer a hazardous waste program that covers identification of hazardous wastes and interim status standards in lieu of the federal program covering those areas. See 40 C.F.R. Sec. 271.121(b). Puerto Rico was never authorized to operate Phase II which consists of a permit program for hazardous waste treatment, storage, and disposal facilities. See id. Therefore, authority for requesting permit applications and issuing permits to hazardous waste facilities in Puerto Rico has always rested with the EPA
 
 
 [4]
 These regulations were issued pursuant to the Puerto Rico Public Policy Environmental Act (Law No. 9 of June 18, 1970, as amended) P.R. Laws Ann. tit. 12, Sec. 1121 et seq. (PRPPEA)
 
 
 [5]
 In addition to arguing that there is no urgency here, the creditor's committee focuses on the amount of money that CORCO is going to have to spend to comply with RCRA and says that the EPA's enforcement action and resulting debts of CORCO should also be dischargeable. Alternatively, the creditor's committee argues that the interim status permit is property protected under the automatic stay, a valuable asset which should be protected, relying on In re Professional Sales Corp., 48 B.R. 651 (Bankr.N.D.Ill.), vacated, 56 B.R. 753 (N.D.Ill.1985), where the bankruptcy court issued an injunction under Sec. 105(a) to prevent the EPA from taking away the debtor's interim status permit
 
 
 [6]
 Without expressing a view as to what constitutes imminent harm and urgent public necessity or as to whether imminent and identifiable harm or urgent public necessity can be said to exist in this case, we simply note that the EPA's permitting procedure and attendant information-gathering system are vital components of the environmental protection system. See infra note 11
 
 
 [7]
 We find nothing in the legislative history of Sec. 362(b)(4) that persuades us that the police and regulatory power exception to the automatic stay can only be invoked where there is a showing of imminent and identifiable harm or urgent public necessity. Appellants point generally to floor statements regarding Sec. 362(b)(4) in which it was noted that the Sec. 362(b)(4) exception "is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." 124 Cong.Rec. H11089, reprinted in 1978 U.S.Code Cong. & Admin.News 6436, 6444-45 (statement of Rep. Edwards); 124 Cong.Rec. S17406, reprinted in 1978 U.S.Code Cong. & Admin.News 6506, 6513 (statement of Sen. DeConcini). We cannot read these statements to exempt from the exception police and regulatory actions designed to protect the public health and safety. We find no basis for reading the admonition that the exception be construed narrowly to exclude anything but those actions which are, in fact, aimed at protecting the government's monetary interest
 Additionally, appellants cite a portion of the House Report in support of their argument:
 Under present [pre-Code] law there has been some overuse of the stay in the area of governmental regulation. For example, in one Texas bankruptcy court, the stay was applied to prevent the State of Maine from closing down one of the debtor's plants that was polluting a Maine River in violation of Maine's environmental protection laws.... The bill [the 1978 Code] excepts these kinds of actions from the automatic stay.
 House Report, supra, at 174-75 (citations omitted) (emphasis added). This passage, with the emphasis added by appellants, is said to evince a congressional intent to limit Sec. 362(b)(4) to cases where the government can show present ongoing pollution posing an imminent threat. We cannot accept this as evidence of such a congressional intent.
 
 
 [8]
 The court also noted that the "exception to the exception" created by Sec. 362(b)(5), making enforcement of money judgments by governmental units subject to the automatic stay, "should be construed narrowly so as to leave to the States as much of their police power as a fair reading of the statute allows." 733 F.2d at 273 (emphasis in original)
 
 
 [9]
 Adding further support to our conclusion that the EPA's regulatory action is exempt from the automatic stay are cases wherein courts faced with non-environmental exercises of police or regulatory powers have interpreted Sec. 362(b)(4). See, e.g., EEOC v. Rath Packing Co., 787 F.2d 318 (8th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986) (automatic stay did not apply to Title VII action); Cournoyer v. Town of Lincoln, 790 F.2d 971 (1st Cir.1986) (Town's action to clear debtor's property of scrap metal and automotive parts exempt from automatic stay); Ahrens Aircraft, Inc. v. NLRB, 703 F.2d 23 (1st Cir.1983) (enforcement of an NLRB order awarding back pay was not subject to automatic stay by virtue of 11 U.S.C. Secs. 362(b)(4) and (5)); NLRB v. Evans Plumbing Co., 639 F.2d 291 (5th Cir.1981) (NLRB proceeding for entry of judgment for back pay is exempt from automatic stay); In re D.H. Overmyer Telecasting Co., 35 B.R. 400 (Bankr.N.D.Ohio 1983) (action by the Federal Communication Commission to strip debtor of its broadcasting license is exempt regulatory action); Donovan v. TMC Industries, Ltd., 20 B.R. 997 (N.D.Ga.1982) (action to enjoin sale of goods produced in violation of Fair Labor Standards Act is excepted regulatory action)
 
 
 [10]
 Section 554(a) provides: "After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. Sec. 554(a)
 
 
 [11]
 We note that appellants' characterization of the proceedings at issue here as attempts to correct mere "technical violations," and therefore, somehow less worthy of exception from the automatic stay, is misguided. First, the exceptions to the automatic stay make no such distinction. Second, the EPA, to protect the public health and safety, must gather information from facilities like CORCO and maintain permitting procedures. Without such information gathering and permitting systems, the EPA would be impeded in its obligation to administer the environmental protection system
 
 
 [12]
 The Third Circuit noted that:
 As the legislative history explicitly notes, the mere entry of a money judgment by a governmental unit is not affected by the automatic stay, provided of course that such proceedings are related to that government's police or regulatory powers.
 Quite separate from the entry of a money judgment, however, is a proceeding to enforce that money judgment. The paradigm for such a proceeding is when, having obtained a judgment for a sum certain, a plaintiff attempts to seize property of the defendant in order to satisfy that judgment. It is this seizure of a defendant-debtor's property, to satisfy the judgment obtained by a plaintiff-creditor, which is proscribed by subsection 362(b)(5).
 Penn Terra, 733 F.2d at 275 (citations omitted) (emphasis in original).
 
 
 [13]
 The recent decision in United States v. ILCO, Inc., 48 B.R. 1016 (N.D.Ala.1985), also rejected the notion that the expenditure of funds will suffice to convert a proceeding into an action to enforce a money judgment, and explained:
 ILCO, as well as other defendants, will be forced to spend money to clean up the hazardous waste sites. Obviously, this will deplete ILCO's assets to the detriment of other creditors. Congress indicated in Sec. 362(b), however, that preserving the debtor's estate was not always the dominant goal. The legislative history ... indicates that the enforcement of an injunction ordering compliance with environmental laws is more important than the debtor's right to have a breathing spell from its creditors or than the creditors' rights to an orderly administration of the estate. Furthermore, if courts were to find, as ILCO contends, that an order which requires the expenditure of money is a "money judgment," then "the exception to section 362
 for government police [and regulatory] action, which should be construed broadly, would instead be narrowed into virtual non-existence.... [A]lmost everything costs something. An injunction which does not compel some expenditure or loss of monies may often be an effective nullity."
 
 
 [48]
 B.R. at 1023 (citing Penn Terra, 733 F.2d at 277-78). But see United States v. Johns-Manville Sales Corp., 13 Envtl.L.Rep. 20310, 20311-12 (1982)
 
 
 [14]
 We note that in Ohio v. Kovacs, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Supreme Court stated that the automatic stay provision did not apply to suits to enforce the regulatory statutes of a state. 469 U.S. at 283-84 n. 11, 105 S.Ct. at 711 n. 11. The Court noted that in Penn Terra the state's effort was held to be directed at enforcing an injunction to require compliance with an environmental law, not to enforce a money judgment. In Kovacs the court noted that in the specific circumstances before it, the clean up duty had been reduced to a monetary obligation and that "[o]n the facts before it, and with the receiver in control of the site, we cannot fault the Court of Appeals for concluding that the cleanup order had been converted into an obligation to pay money, an obligation that was dischargeable in bankruptcy." Id. at 283, 105 S.Ct. at 711. The Court noted that Ohio, instead of prosecuting Kovacs under the environmental laws--as the EPA intends to do in this case--secured the appointment of a receiver who was ordered to take possession of Kovacs' nonexempt assets as well as the assets of the corporate defendants and to comply with the injunction entered against Kovacs. It dispossessed Kovacs. What the receiver wanted from Kovacs after the bankruptcy was the money to defray the clean up costs. At oral argument before the Supreme Court, the state's counsel conceded that after the receiver was appointed, the only performance sought from Kovacs was the payment of money
 We believe that Kovacs can properly be read as an acceptance of Penn Terra 's money judgment analysis, and, at the very least, should be seen as casting no doubt on Penn Terra. The Supreme Court in Kovacs made it clear that it was the dispossession of Kovacs' assets and the appointment of a receiver that turned the injunction in that case into a dischargeable monetary obligation.
 
 
 [15]
 The EPA in the instant case made it clear to the bankruptcy court that it in no way intends to bring CORCO into compliance with the applicable environmental laws and regulations by dispossessing CORCO of its assets or by seeking compliance by a money judgment. Rather, the EPA is seeking to bring CORCO into compliance with the federal environmental laws and the hazardous waste regulations of Puerto Rico
 
 
 [16]
 The legislative history of the Bankruptcy Code explains that:
 Subsection (b) lists five exceptions to the automatic stay. The effect of an exception is not to make the action immune from injunction.
 The court has ample other powers to stay actions not covered by the automatic stay. Section 105, of proposed title 11, derived from Bankruptcy Act Sec. 2a(15), grants the power to issue orders neecssary [sic] or appropriate to carry out the provisions of title 11. The bankruptcy courts are brought within the scope of the All Writs Statute, 28 U.S.C. 1651 (1970), and are given the powers of a court of law, equity, and admiralty (H.R. 8200, Sec. 243(a), proposed 28 U.S.C. 1481). Stays or injunctions issued under these other sections will not be automatic upon the commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon the commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine on a case-by-case basis whether a particular action which may be harming the estate should be stayed.
 House Report, supra, at 342; Senate Report, supra, at 51.
 Courts considering the scope of Sec. 105 have seen it as an avenue available for staying actions that are found to fall within an exception to the automatic stay. See Browning v. Navarro, 743 F.2d 1069, 1084 (5th Cir.1984); State of Missouri v. United States Bankruptcy Court, 647 F.2d 768, 776-77 (8th Cir.1981), cert. denied, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982); In re Bel Air Chateau Hosp., Inc., 611 F.2d 1248, 1251 (9th Cir.1979); Penn Terra, 733 F.2d at 273; In re Global Int'l. Airways Corp., 48 B.R. 849, 851 (W.D.Mo.1985); In re Professional Sales Corp., 48 B.R. at 660; In re Jerzak, 47 B.R. 771, 773 (Bankr.W.D.Wisc.1985); In re Farmers & Ranchers Livestock Auction, Inc., 46 B.R. 781, 796 (Bankr.E.D.Ark.1984); In re King Memorial Hosp., Inc., 4 B.R. 704, 709 (Bankr.S.D.Fla.1980); cf. NLRB v. Superior Forwarding, Inc., 762 F.2d 695, 699 (8th Cir.1985).
 We note however, that the powers of a court under Sec. 105 are not unlimited. See, e.g., United States v. Sutton, 786 F.2d 1305, 1307-08 (5th Cir.1986); Southern Ry. Co. v. Johnson Bronze Co., 758 F.2d 137, 141 (3d Cir.1985); In re Fox, 725 F.2d 661, 663 (11th Cir.1984); Johnson v. Nat. Bank of Montevideo, 719 F.2d 270, 273 (8th Cir.1983), cert. denied, 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); In re Pirsig Farms, Inc., 46 B.R. 237, 240 (D.Minn.1985); In re Wood, 33 B.R. 320, 322-23 (Bankr.D.Idaho 1983); In re Candor Diamond Corp., 26 B.R. 850, 851 (Bankr.S.D.N.Y.1983); In re Dunkle Assocs., Inc., 19 B.R. 481, 485-86 (Bankr.E.D.Pa.1982). While the question of where the outermost boundaries of a court's powers under Sec. 105 fall is an interesting one and one worthy of consideration, that question is not presently before this court and we do not attempt to resolve that question here.
 
 
 [17]
 With respect to the likelihood of success on the merits, the district court went on to note that the loss of interim status on November 8, 1985, also precludes success on the merits. Additionally, the court noted that an injunction would disserve the public interest since it would delay a determination about possible groundwater contamination
 
 
 [18]
 Appellants are urging that the bankruptcy court and the district court focused on the wrong issue--the issue is not whether CORCO will prevail on the merits, but simply, whether a proceeding must be stayed so that reorganization efforts mandated by the Bankruptcy Code will not be thwarted by the proceeding. They urge what can best be described as a "balancing of the equities" approach
 
 
 [19]
 CORCO disputes the conclusion that it "conceded" that the EPA would prevail in an enforcement action against it. Even if we were to accept CORCO's argument, we would still find that the district court did not abuse its discretion because there is sufficient support for the conclusion that there is not a substantial likelihood that CORCO would prevail
 
 
 [20]
 Additionally, we need not delay long in disposing of a final argument raised in this case. At this late stage in these proceedings, and at the veritable tail-end of its brief, the creditor's committee argues that the district court erred in failing to hold a "de novo hearing." We note that CORCO does not raise this argument at all. We find this argument to be disingenuous, at best, given the fact that the creditor's committee, as well as the Indenture Trustee and CORCO, took an appeal from "the final order of the Bankruptcy Court" to the district court. See Notice of Appeal of the Official Committee of Unsecured Creditors (May 24, 1985)