In re EAGLE BUS MANUFACTURING, INC., Greyhound Lines, Inc., et al., Debtors.

NATIONAL LABOR RELATIONS BOARD and Amalgamated Council of Greyhound Local Unions, Plaintiffs–Appellants,

v.

GREYHOUND LINES, INC., et al., Defendants–Appellees.
(Two Cases)

ADMINISTRATOR, OHIO BUREAU OF EMPLOYMENT SERVICES, Plaintiff–Appellants,

v.

EAGLE BUS MANUFACTURING, INC., et al., Defendant–Appellee.

Civ. A. Nos. B–91–021, B–91–117, and B–91–213.

United States District Court, S.D. Texas, Brownsville Division.

May 10, 1993.

Shelby A. Jordan, Corpus Christi, TX, Jeffrey Freund, Bredhoff & Kaiser, Washington, DC, for Greyhound Local Union.

Margery E. Lieber, Asst. Gen. Counsel, N.L.R.B., Washington, DC, for N.L.R.B.

Alan Shore Gover, Weil, Gotshal, & Manges, Houston, TX, for Greyhound Lines, Inc.

James E. Spiotto & Stephen E. Garcia, Chapman & Cutler, Chicago, IL, for Official Steering Committee for Greyhound.

David Snodgrass, Gardere & Wynne, Dallas, TX, for Official Unsecured Creditors' Committee.

## STATEMENT OF THE FACTS

VELA, District Judge.

Currently before this Court are appeals filed by the National Labor Relations Board ("NLRB"), the Amalgamated Council of Greyhound Local Unions ("Union")

and the Administrator, Ohio Bureau of Employment Services ("Ohio Bureau").

Greyhound Lines Inc., ("Greyhound") operates the only nationwide, inter-city ground transportation network in this country and employs several thousand people nationwide. The vast majority of Greyhound's employees are represented for purposes of collective bargaining by the Union. Greyhound had entered into a collective bargaining agreement with the Union which was set to expire at 11:59 p.m. on March 1, 1990. In anticipation of the expiration of this contract Greyhound and the Union initiated bargaining for a successor contract in November of 1989. The negotiations were unsuccessful and upon expiration of the existing contract a strike was initiated by the Union at 12:01 a.m. on March 2, 1990.

Believing the parties were at impasse, Greyhound unilaterally implemented certain terms of its final pre-contract expiration proposal at 3:59 p.m. on March 2, 1990. Alleging this unilateral contract implementation was premature, General Counsel for the NLRB filed a complaint on May 30, 1990 asserting that the Union's strike was caused by this alleged unfair labor practice.[1]

The strike had a crippling and financially devastating effect on Greyhound. Consequently, on June 4, 1990 Greyhound and several affiliated entities filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code. Pursuant to their unfair labor practices claim the NLRB filed a "Proof of Multiple Claims for Wages, Salaries or Commissions" in the Greyhound Bankruptcy for $85,676,023. This claim represented possible back pay, benefits and interest liability based on a future, contingent NLRB award against Greyhound.[2]

The strike caused thousands of striking Greyhound employees to bring actions for unemployment compensation in various states across the country, including Ohio. However, prior to the filing of the bankruptcy petition, a hearing on the unemployment claims was held before an Administrative Hearing Officer to determine the cause of Greyhound's employees' unemployment. The Administrative Hearing Officer issued a Decision on May 17, 1990 and determined the cause of the work stoppage to be a lockout. The Officer further ruled that the employee/claimants were qualified to receive unemployment benefits under the Ohio Unemployment Compensation Acts[3]. Pursuant to the large number of potential claimants, the Ohio Bureau of Employment Services ("Ohio Bureau") filed a claim against Greyhound wherein the Bureau sought to have Greyhound's experience rating redetermined (increased) as to unemployment claims arising out of the 1990 labor dispute. As a result of the bankruptcy petition filed by Greyhound on June 4, 1990, all actions were stayed pursuant to Title 11 U.S.C. § 362. On August 23, 1990, the State of Ohio, Unemployment Compensation Review Board ("Ohio Board") filed its Motion for Relief from Stay requesting that the automatic stay be modified to permit the adjudication of unemployment claims brought by striking employees against Greyhound in Ohio[4], and the recalculation of Greyhound's unemployment compensation experience rating in Ohio. Realizing that they would be responsible for recalculating Greyhound's experience rating, the Ohio Bureau filed a sepa-

1. Greyhound has responded to these allegations of unfair labor practices by arguing that the strike was the result of economic impasse between the parties and not unfair labor practices.
   The "complaint" alleging unfair labor practices is currently before an administrative law judge.

2. The NLRB subsequently filed an "Amended Proof of Claim" on August 19, 1991 alleging Greyhound's potential statutory liability as $143,183,976.

3. On June 7, 1990, Greyhound filed notice of appeal to the State of Ohio, Unemployment Compensation Board requesting the Administrative Hearing Officer's decision be reversed. Before the Board could respond, Greyhound filed its Chapter 11 petition.

4. On August 20, 1990, Ohio Board filed a motion for relief from stay so a hearing could be held on Greyhound's appeal from the Bureau's Administrative Hearing Officer's Decision.

rate Motion for relief from the automatic stay, requesting a modification of the stay by the Bankruptcy Court so that Greyhound's liability for unemployment compensation taxes could be redetermined on the basis of the Board's adjudication of the unemployment compensation claims against Greyhound.

In response to both motions the Bankruptcy Court held a hearing on September 26, 1990. Upon conclusion of the hearing the Bankruptcy Court modified the automatic stay to permit the prosecution of unemployment compensation claims to proceed. However, the Bankruptcy Court expressly held that the stay would not be lifted to permit the Ohio Board nor the Ohio Bureau to adjust Greyhound's unemployment tax rate on the basis of the adjudication of the unemployment tax claims.[5] On November 9, 1990, the Ohio Bureau filed its Notice of Appeal from the Bankruptcy Court's Order. This appeal is currently before this Court as Civil Action No. B–91–021.

On December 10, 1990, Greyhound filed a motion with the Bankruptcy Court seeking to have all portions of the NLRB's claim accruing after June 4, 1990, classified as a general unsecured claim. Following briefing by Greyhound, the NLRB, the Union and other interested parties, the Bankruptcy Court issued its oral opinion on March 26, 1991, followed by a written Order, entered on May 1, 1991, classifying the NLRB's claim for post-petition back pay as a general unsecured claim. Both the NLRB and the Union filed notices of appeal and motions for leave to appeal with respect to the Classification Order. Both appeals have been consolidated under the Civil Action No. B–91–117.

On November 20, 1991, Greyhound filed a Motion requesting the Court to Estimate the Claims of the National Labor Relations Board. By their motion, Greyhound sought to have the court exercise its authority, pursuant to 502(c) of the Bankruptcy Code, by estimating the amount of all NLRB claims against Greyhound.

While conceding that estimation would be appropriate for some purposes, it was the contention of the NLRB and the Union that the Bankruptcy Court should defer to the NLRB's administrative expertise and estimate the NLRB claim in the amount unilaterally calculated by the NLRB as asserted in its proof of claim. The NLRB and the Union further disputed the Bankruptcy Court's jurisdiction and authority to estimate the back pay claim at any amount other than as set forth in the proof of claim or to estimate the back pay claim for purposes of distribution under a plan of reorganization.

The Bankruptcy Court recognized that a full trial of the NLRB complaint could take approximately 200 days. Recognizing a need to estimate this unliquidated claim, on February 14, 1991, the Bankruptcy Court announced an interim ruling to estimate the back pay claim. The Bankruptcy Court conducted a summary trial to estimate the back pay claim on April 4 and 5, 1991.

On May 14, 1991, the Bankruptcy Court announced its estimation decision from the bench. After reviewing the NLRB's procedure's and the charges against Greyhound the court found, based on the testimony of the NLRB's expert witness [6] that the most likely amount of striking employees' lost earnings—and hence, Greyhound's back liability if the strike were found to be an unfair labor practice strike—was $125,000,-000. The Bankruptcy Court then discounted this amount based on the assessment of three factors: (i) the NLRB General Counsel's "likelihood of success"; (ii) the "likelihood of settlement" of the NLRB's claim; and (iii) the "Debtor's ability to pay such a judgment." The Bankruptcy Court did not identify any one factor upon which it placed more emphasis in reaching its decision to discount the NLRB claim by seventy-five percent (75%). Pursuant to this dis-

---

**5.** The Bankruptcy Court's final written Order of the bench ruling was entered on the court's docket by the clerk of the Bankruptcy Court on October 30, 1990.

**6.** Harvard labor economist Richard Freeman.

count the court issued an Order estimating the NLRB claim at $31,250,000.

The Union and the NLRB each objected to confirmation of Greyhound's Plan of Reorganization, specifically objecting to the Plan's treatment of the back pay claim.[7] On October 11, 1991, the Bankruptcy Court entered its Confirmation Order and accompanying Findings of Fact and Conclusions of Law. 134 B.R. 584. The Confirmation Order overruled all objections to confirmation of Greyhound's Third Amended Plan of Reorganization.

On October 16, 1991, the Union filed a notice of appeal from the Confirmation Order pursuant to Bankruptcy Rule 8001(a). In addition, the NLRB filed notice of appeal from the Confirmation Order on October 17, 1991. Both appeals have been consolidated under the Civil Action No. B–91–213.

### JURISDICTION

Pursuant to Title 28 U.S.C. 158(a) this Court exercises jurisdiction over all Orders appealed from the Bankruptcy Court in Civil Action No. B–91–021, Civil Action No. B–91–117 and Civil Action No. B–91–213.

### AUTOMATIC STAY

Pursuant to the ALJ's ruling that the displaced employees of Greyhound were entitled to receive unemployment benefits, the Ohio Bureau brought an action against Greyhound seeking a redetermination of Greyhound's experience rating. Pursuant to Title 11 U.S.C. § 362, Ohio Bureau's action was stayed upon Greyhound's filing for bankruptcy protection on June 4, 1990.

Title 11 U.S.C. § 362 in relevant part, states that:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302 or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 USC § 78eee(a)(3)), operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

. . . .

Consideration being given to the Motions for Relief from the Automatic Stay filed by the Ohio Board and the Ohio Bureau, the Bankruptcy Court entered the following findings:

1. The automatic stay under section 362(a) of the Bankruptcy Code applies to the unemployment compensation proceedings being conducted by the [Ohio] Board and the [Ohio] Bureau (the "Proceedings").

2. Any harm that might be occasioned upon the Debtors by the necessity of having to defend the Proceedings is outweighed by the potential harm from further delay to the employees asserting the unemployment claims.

In accordance with these findings the Bankruptcy Court Ordered that the automatic stay be lifted to allow the Ohio Board and the Ohio Bureau to conduct unemployment compensation proceedings in order to determine the unemployment compensation status of the various employees in the State of Ohio. Bankruptcy Court's Order

---

**7.** Third Amended Plan of Reorganization 8.12(c)(3) expressly provides:

If the NLRB Claim is not subordinated to all other Allowed Claims against GLI by Final Order, upon entry of the NLRB Proceeding, and in any claim objection proceeding filed with respect to the NLRB Claim, the NLRB Claim shall (i) become an Allowed GLI Class

7 Unsecured Claim in the amount of the lesser of (x) the amount estimated by the Bankruptcy Court, or (y) the amount of the Claim as otherwise determined and (ii) as so Allowed, shall receive GLI Class 7 Unsecured Claim treatment from the Escrowed Distribution Amount attributable to the NLRB Claim, or the proceeds thereof.

on Motion For Relief From The Automatic Stay, filed Oct. 29, 1990. The Bankruptcy Court further Ordered that the automatic stay not be lifted to allow the Ohio Board or the Ohio Bureau [8] to "redetermine the experience rating, unemployment compensation tax rate or any other rating of the Debtors.…" *Id.* However, the Order did allow the Ohio Bureau to make "preliminary calculations of what it believ[ed] the Debtors' unemployment tax rate [would] be …" based on any findings from the unemployment compensation proceedings. *Id.*

Finally, the Bankruptcy Court Ordered that any determinations made by the Ohio Board, pursuant to Proceedings as permitted by the Court's Order, shall be neither binding on the Debtor nor have res judicata effect with respect to any redetermination of "the experience rating, unemployment compensation tax rate or any other rating of the Debtors.…" *Id.* The resultant effect was that any pre-petition awards arising out of the labor dispute at issue could not be charged against Greyhound's unemployment tax account and ultimately collected by the debtor.

From the Bankruptcy Court's Order of October 29, 1990 arises Ohio Bureau's appeal. At issue before this Court is whether or not the Bankruptcy Court erred by refusing to lift the automatic stay to permit the Appellant, Ohio Bureau, to redetermine the unemployment compensation contribution rating of the Appellees'–Debtors', Greyhound's, or any other rating of the Debtors relative to all pre-petition unemployment compensation awards of benefits, including those awards arising out of the 1990 labor dispute between Greyhound and its employees.

■ Ohio Bureau contends that pursuant to 11 U.S.C. § 362(b)(4) the Bankruptcy Court should have ordered the automatic stay lifted; thereby permitting the Ohio Bureau, as a "governmental unit" [9], to redetermine Greyhound's unemployment experience rating and obtain a judgment

against Greyhound in the amount of Greyhound's ultimate unemployment compensation tax liability for claims paid pursuant to the 1990 labor dispute. Ohio Bureau further contends that § 362(b)(5) permits a money judgment to be entered against Greyhound but concedes that enforcement of any such money judgment prior to the stay being lifted is prohibited under 11 U.S.C. § 362(b)(5) which states:

(b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 USC 78eee(a)(3)), does not operate as a stay—.…

(4) under subsection (a)(1) of this section, to the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

(5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; …

In support of its position, Ohio Bureau cites *National Labor Relations Board v. Evans Plumbing Company,* 639 F.2d 291 (5th 1981). In *Evans,* an administrative law judge ("ALJ") found that Evans Plumbing Co. ("Evans") had committed an unfair labor practice by discriminatorily discharging two employees. The Board adopted the ALJ's decision and the National Labor Relations Board ("NLRB") petitioned the court to enter a summary judgment to enforce the Board's decision ordering Evans to reinstate with back pay the two discharged employees. Evans had filed a voluntary petition in bankruptcy and opposed the entry of a summary judgment on the ground that the proceedings before the NLRB should have been stayed pursuant to Title 11 U.S.C. § 362(a)(1).

---

**8.** In addition, the Order expressly prohibited the stay from being lifted for "any other office, branch, or agency of the State of Ohio."

**9.** Title 11 U.S.C. 101(27) "governmental unit" means United States; State; Commonwealth; District, Territory; **department, agency, or instrumentality of**.… **a State,**.…

In the *Evans* opinion, the Fifth Circuit Court of Appeals recognized the NLRB as a "governmental unit", acting under its police and regulatory authority, seeking entry of a judgment against Evans for its violation of federal law. *Evans*, 639 F.2d at 293. The court granted the Board's petition for summary entry of judgment for injunctive relief and for back pay.[10] *Id.*

In the *Matter of Commonwealth Oil Refining Co.*, 805 F.2d 1175 (5th 1986) the Fifth Circuit recognized a distinction between the entry of a money judgment and the enforcement of said judgment. At issue before the court was whether a debtor, who had filed a petition under Chapter 11 of the Bankruptcy Code, could be forced to comply, prior to filing its plan of reorganization, with federal and state environmental laws designed to protect the public health and safety. In *Commonwealth*, the United States Environmental Protection Agency ("EPA") brought an administrative action against Commonwealth Oil Refining Co., ("CORCO") directed at bringing CORCO into compliance with state and federal environmental laws.

The Fifth Circuit affirmed the district court and held that the EPA was authorized to force CORCO's compliance with federal and state environmental laws and regulations. *Commonwealth*, 805 F.2d at 1183. Accordingly, it was the court's holding that the enforcement actions of the EPA did not fall "within the ambit of § 362(a)(1) because they [were] actions to enforce police and regulatory powers, thus falling within the § 362(b)(4) exception to the automatic stay." *Id.* at 1183–84. However, the court expressly noted that § 362(b)(5) creates an exception to the exception from automatic stay, in that actions to **enforce money judgments** are automatically stayed irrespective of the fact that they are actions in furtherance of a police or regulatory power. *Id.* at 1183. (emphasis added)

In consideration of Ohio Bureau's argument that its action falls within the § 362(b)(4) exception this Court looks to the

purpose of this exception as set forth in the legislative history:

> Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, **where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.**

House report No. 95–595, 95th Cong., 2d Sess. at 343 reprinted in 1978 U.S.Code Cong. and Adm.News, 5787, 6299. *See also* Senate Report No. 95–989, 95th Cong., 2d Sess. p. 52, reprinted in 1978 U.S.Code Cong. and Adm.News, 5787, 5838.

In reference to § 362(b)(4) of the Bankruptcy Code, Congressman Don Edwards, Chairman of a Subcommittee of the Judiciary Committee stated:

> Section 362(b)(4) indicates that the stay under section 362(a)(1) does not apply to affect the commencement or continuation of an action or proceeding by a governmental unit to enforce the governmental unit's police or regulatory power. **This section is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate.**

124 Cong.Record H 11089, reprinted in (1978) U.S.Code Cong. and Ad.News 6436, 6444–6445.

*Evans* and *Commonwealth* clearly support the proposition that a governmental unit in certain instances may bring action against a bankruptcy petitioner under § 362(b)(4) to enforce its police or regulatory power and have a monetary judgment entered against said petitioner under § 362(b)(5). However, as stated above it

---

**10.** The court however expressed no opinion as to whether an action to "execute or enforce a

money judgment would be exempt from the automatic stay." *Id.*

was clearly the intent of Congress that the application of § 362(b)(4) be limited to governmental units seeking to prevent or stop the violation of particular laws or seeking to recover damages arising from the violation of such laws. A study of the legislative history further shows the intent of Congress to limit the application of § 362(b)(4) to actions by a governmental unit seeking to protect public health and safety. Accordingly, this Court finds the facts in the case at bar clearly distinguishable from those in *Evans* and *Commonwealth* and further finds the holdings in both *Evans* and *Commonwealth* to support the Bankruptcy Court's ruling.

Unlike the NLRB in *Evans,* Ohio Bureau did not seek to have the automatic stay lifted so that it could bring suit against Greyhound for allegedly violating federal or state labor laws; and unlike the EPA in *Commonwealth,* Ohio Bureau did not move the Bankruptcy Court to lift the stay to permit the prosecution of federal and state environmental law and regulation violations. In fact Ohio Bureau did not bring suit against Greyhound alleging a violation of any law and as such does not seek damages for the alleged violation of any law[11]. Rather, the Ohio Bureau seeks to protect its pecuniary interest in the property of Greyhound the debtor or property of Greyhound's estate by liquidating its tax claim against Greyhound. The Ohio Bureau's tax claim is not based on the violation of any law and was not pursued in an effort to protect the public health and safety of the citizens of Ohio. Pursuant to Congress' intent that the exception under § 362(b)(4) and (5) be narrowly construed, this Court is of the opinion that Ohio Bureau's claim does not fall within the ambit of exception § 362(b)(4) and as such the Ohio Bureau was not entitled to seek the entry of a monetary judgment against Greyhound.

The legislative history of 11 U.S.C. § 362 emphasizes the rationale behind granting the automatic stay.

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

Bankruptcy reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, p. 340 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 6296–97.

The Fifth Circuit addressing chapter 11 reorganization proceedings, underscored the purpose of § 362 as a legal method designed to prevent:

> the dissipation or diminution of the bankrupt's assets while rehabilitative efforts are undertaken and [to prohibit] the proliferation of numerous claims in different forums against the debtor.... The automatic stay thus imposes a moratorium on all actions against the debtor or its property and assets. It insures respite for the debtor so that it may attempt to reorganize or decide to liquidate and promotes the overriding bankruptcy policy of equal distribution of a debtor's assets among creditors.

**11.** Although the ALJ ruled that the displaced employees of Greyhound were entitled to receive unemployment compensation, the ruling was based upon a finding that the employees had not left their jobs voluntarily but that they had been forced by their employer to leave their jobs. There was no finding by the ALJ that Greyhound had violated any labor laws.

Although the Union has instituted claims against Greyhound with the NLRB alleging unfair labor practices there has been no final adjudication of these claims.

In the *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1146 (5th Cir.1987).

Although the Bankruptcy Court lifted the stay to permit the Ohio Board and the Ohio Bureau to determine the unemployment compensation status of Greyhound's displaced employees, the Bankruptcy Court recognized the harm which would be occasioned by requiring Greyhound to defend itself in the unemployment compensation actions which were pending in all 48 of the lower contiguous states. The failure or inability to adequately prepare and defend against each of these pending actions would have had a truly adverse impact upon Greyhound's estate. To allow such a chain of events to occur is inconsistent with the intent and purpose of the Bankruptcy Code. Pursuant to these considerations and this Court's finding that Ohio Bureau's claim does not fall within the ambit of § 362(b)(4) this Court **AFFIRMS** the Bankruptcy Court's ruling denying Ohio Bureau's Motion For Relief From Automatic Stay.

■ On appeal Ohio Bureau erroneously contends that the Bankruptcy Court's Order permanently enjoins Ohio Bureau from seeking any future redetermination of Greyhound's experience rating. A review of the Bankruptcy Court's Order, from which this appeal is taken, fails to reveal any language from which could be inferred an express or implied intent to permanently enjoin Ohio Bureau from pursuing their claim against Greyhound.

In addressing Ohio Bureau's argument this Court finds the following provisions of the Bankruptcy Code dispositive of the issue. Title 11 U.S.C. § 362(c) provides:

(c) Except as provided in subsection (d), (e), and (f) of this section—

(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate; and

12. In part the NLRB alleges within the Complaint:

(2) **the stay of any other act under subsection (a) of this section continues until the earliest of—**

(A) the time the case is closed;

(B) the time the case is dismissed; or

(C) **if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.**

Title 11 U.S.C. § 1141(d) further provides:

(d)(1) Except as otherwise provided in this subsection, in the plan, or **in the order confirming the plan, the confirmation of a plan**

(A) **discharges the debtor from any debt that arose before the date of such confirmation** ...

The Bankruptcy Court's Order Confirming the Third Amended Plan of Reorganization expressly discharges all Debtors "from any debt that arose before the date of entry of this Order...." as permitted by "the Bankruptcy Code, including § 1141(d) of the Bankruptcy Code...." Bankruptcy Court's Order Confirming Third Amended Plan of Reorganization, filed Oct. 11, 1991. Therefore, the Bankruptcy Court's entry of the Confirmation Order lifted the automatic stay as to Ohio Bureau's claim. Pursuant to the stay being lifted, there currently exists no legal mechanism precluding Ohio Bureau from pursuing their claim against Greyhound.

### BANKRUPTCY COURT'S CLASSIFICATION ORDER

Pursuant to Greyhound's alleged unfair labor practices, ATU filed grievances with the National Labor Relations Board (NLRB) against Greyhound claiming that Greyhound had not bargained in good faith. In May, 1990, the General Counsel of the NLRB announced that the ATU's charges were "without merit." Nonetheless, General Counsel for the NLRB issued forth a complaint [12] against Greyhound

1. That Greyhound unilaterally modified the terms and conditions of employment on

which alleges that Greyhound's unlawful actions "caused and/or prolonged" the strike that the Union commenced on March 2, 1990, thereby making the strike an "unfair labor practice strike." NLRB Complaint PP 12(A) 13(A)(xv).[13]

On May 22, 1990, and later on June 26, 1990 the Union made an unconditional offer to return to work. On both occasions Greyhound rejected the Union's offer. Accordingly, the NLRB Complaint further alleges that Greyhound's refusal to reinstate the striking employees is an additional unfair labor practice which violates § 8(a)(3) of the NLRA.

On or about November 13, 1990, the NLRB filed its Proof of Multiple Claims for Wages, Salaries or Commissions and sought administrative expense priority pursuant to § 507(a)(1) for any part of its claim **accruing** after June 4, 1990. In relevant part the NLRB's Proof of Claims is for wages and other benefits which arise from Greyhound's alleged unlawful action in having implemented on March 2, 1990, the terms of its final offer without having reached impasse, its alleged unlawful refusal to reinstate striking employees since May 22, 1990, and its alleged unlawful discharge of approximately 200 employees. With regard to the discharged employees, the NLRB and the ATU contend that approximately 50 of the employees were discharged **after** Greyhound filed its Chapter 11 Petition. Accordingly, the Proof of Claim, as it pertains to those 50 claimants, is a post-petition claim for back-pay and benefits which would have been earned but for the allegedly unlawful discharge. Similar to the former Greyhound employees whose claims arose pre-petition, the post-petition claimant's damages continue to accrue post-petition.

Realizing the potential liability to the NLRB for back pay and benefits on behalf of all pre-petition claimants whose damages continued to accrue post-petition, Greyhound moved the Bankruptcy Court to "classify any part of the NLRB's claim that accrues after June 4, 1990, as a general unsecured claim that is not entitled to administrative priority under § 503(b)(1)(A) of the Bankruptcy Code." Motion of Greyhound Lines, Inc. for Order Classifying Claim of the National Labor Relations Board—filed December 10, 1990.

Pursuant to the Bankruptcy Court's telephonic ruling and written Order classifying the NLRB claim for post-petition back pay as a general unsecured claim, the NLRB filed a Notice of Appeal on June 3, 1991. In Civil Action No. B–91–117 the following issues are raised on appeal:

1. whether an NLRB claim for back pay and benefits due to employees who were allegedly discriminatorily discharged after their employer filed for reorganization under Chapter 11 is entitled to priority as an administrative expense under § 503(b) and § 507(a)(1) of the Bankruptcy Code;

2. whether that portion of an NLRB claim for back pay and benefits that accrues after the employer has filed for reorganization is entitled to priority as an administrative expense under § 503(b) and § 507(a)(1) of the Bankruptcy Code.

In relevant part the NLRB claim can be broken into two categories:

(i) The claims of unfair labor practice strikers arising pre-petition for (post-petition) back pay and accrued benefits;

(ii) The claims of employees discharged post-petition for (post-petition) back pay and accrued benefits.

March 2, March 5, and May 15, 1990 without having bargained to impasse with the Union. 2. That Greyhound unilaterally and unlawfully implemented an Active Duty Operator proposal which, by governing employee recall and bidding rights would punish striking employees and infringe upon an employees' statutory rights. 3. That Greyhound unilaterally implemented an Experience–Based Seniority proposal

which allegedly gave additional seniority to those employees hired as strike replacements.

**13.** On November 6, 1990 the General Counsel amended his complaint to allege that Greyhound implemented a reduced contract offer on May 15, 1990, without having reached impasse and to add allegations concerning miscellaneous **strike-related** misconduct.

The NLRB on appeal argues that the bankruptcy court Classification Order is in error, and incorrectly denies administrative priority to post-petition accruals of unfair labor practice liability. Specifically, the NLRB argues that the bankruptcy court erred in:

1.) failing to accord administrative priority status to wages accruing employees unlawfully discharged during the post-petition period; and

2.) failing to accord administrative priority status to the wages of Unfair Labor Practice Strikers and other Pre–Petition Discriminatees accruing after June 4, 1990.

### *ADMINISTRATIVE PRIORITY*

#### Wages accruing employees discharged post-petition.

In its Motion to Classify, Greyhound specifically set forth the facts and addressed the issues surrounding the claims of those striking employees whose claims arose from pre-petition events and conduct but whose damages continue to accrue post petition. Section III of the motion titled *THE DISPUTED NLRB BACK PAY CLAIM* focusses on the negotiations for a new labor agreement, the strike implemented by the employees represented by the ATU, and the specific events which resulted in Greyhound implementing its May 5, 1990 economic proposals once the parties had allegedly reached an impasse.

During oral argument before the bankruptcy court counsel for Greyhound argued:

[t]his motion presents a very narrow issue to the court today. And that issue is whether a claim for back pay, which *would not exist but for pre-petition actions* of the debtor, is entitled to cost of administration priority treatment to the extent that it accrues post-petition.

Transcript of oral argument on Motion to Classify—held before Judge Schmidt, January 24, 1991. (emphasis supplied)

Counsel for the NLRB during oral argument stated that "[t]he unfair labor practice involved here is *the employer's refusal to reinstate the (striking) employees* when they made their unconditional offer to return to work." *Id.* at 47. (emphasis supplied).

In the bankruptcy court's oral ruling on March 26, 1991, the court expressly states:

it seems to me that the entire scenario that provides the basis for the claim was *completed before the commencement of the bankruptcy case* and became the basis for an unfair labor practice charge filed by union with the NLRB and for the NLRB's proof of claim filed herein *which is the subject of the Greyhound's classification motion.... [T]he transaction that led to the complaint occurred pre-petition....* [T]hat claim should be classified as a pre-petition, unsecured claim....

Transcript from telephonic ruling on Motion to Dismiss the Equitable Subordination Adversary and the Motion to Classify the claim of the N.L.R.B. p. 12. (emphasis supplied)

In accordance with the bankruptcy court's telephonic ruling the court entered a written Order on May 15, 1991, wherein the court:

[o]rdered any part of the claim, if any, of the National Labor Relations Board that accrues after June 4, 1990, shall be a general unsecured claim that is not entitled to administrative expense priority under Section 503(b)(1)(A) of the Bankruptcy Code.

The NLRB contends that the bankruptcy court's classification Order erroneously classified the post-petition claim of the approximately 50 discharged employees as general unsecured.

In addressing this point of error this Court has reviewed the NLRB's Proof of Claim, Greyhound's Motion to Classify, the transcript from the Classification Hearing, the transcript from the bankruptcy court's telephonic ruling, as well as the bankruptcy court's written Order. While the Court recognizes that the bankruptcy court's written Order contains somewhat broad and general language, this Court further finds that a review of the classification

motion, hearing transcript, telephonic ruling transcript and written Order unequivocally reveals the fact that it was the intent of Greyhound, the NLRB and the ATU as well as the bankruptcy court to address the issue of classification, only as it pertains to the Pre-petition claimants. Greyhound's potential liability arising from alleged pre-petition unfair labor practices was immense. In order for a feasible reorganization "Plan" to be devised it was imperative that the drafters of the "Plan" address the issue of potential liability. Therefore, the drafters assumed a posture of impending liability in order to go forward with the bankruptcy proceedings. Logically, this allowed the drafters to address issues involving the extent of Greyhound's potential liability as well as the issue of priority which was to be afforded a judgment entered in favor of the pre-petition claimants and make provisions for such within the body of the "Plan".

Accordingly, it is the finding of this Court that the bankruptcy court's Classification Order does not address the classification nor the issue of priority to be afforded the NLRB's claim arising from Greyhound's alleged unlawful discharge of post-petition employees. This issue having not been addressed by the bankruptcy court in its Classification Order is therefore not ripe for appeal and not properly before this Court.

### Wages of Unfair Labor Practice Strikers and other Pre–Petition Discriminatees accruing after June 4, 1990.

The bankruptcy court in its Classification Order addressed only that portion of the back pay claim accruing post-petition. Therefore, assuming the NLRB has an unfair labor practices claim against Greyhound on behalf of the striking employees and other alleged Pre–Petition Discriminatees, the question to be addressed by this Court is where does the portion of the NLRB Claim that results from Greyhound's post-petition accrual of unfair labor practice liability fit in the bankruptcy priority scheme?

In addressing the issue of priority this Court looks to the express directives of the Bankruptcy Code, specifically Title 11 U.S.C. §§ 507 and 503.

Section 507 provides in relevant part:

### § 507 Priorities.

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) of this title, . . . .

(3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay—

(A) earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) to the extent of $2,000 for each such individual.

Section 503 provides in relevant part:

### § 503. Allowance of administrative expenses.

(a) An entity may file a request for payment of an administrative expense.

(b) After notice and a hearing, there shall be allowed administrative expenses, . . . . including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case. . . .

■ In order to determine the priority to be afforded the NLRB back pay claim this Court first looks to the issue of whether the back pay claim arose pre-petition or post-petition. As such, the Court notes that on:

March 1, 1990—Contract negotiations broke off, Union employees began their strike and Greyhound unilaterally implemented the terms of a contract offer originally made on January 10, 1990.

March 17, 1990 and May 5, 1990—Contract negotiations resumed without a contract agreement being reached.

May 22, 1990—Greyhound rejects an unconditional offer made by Union employees to return to work under the terms of the old collective bargaining agreement which expired on March 1, 1990.[14]

June 4, 1990—Greyhound files Chapter 11 bankruptcy petition.

The NLRB in its brief argues that Greyhound's failure to reinstate striking employees pursuant to their unconditional offer to return to work constitutes a continuing actionable violation of the NLRA. Accordingly, the NLRB argues that Greyhound's failure to reinstate striking employees subsequent to June 4, 1990, has given rise to a post-petition back pay claim.

The Union's offer to return to work and Greyhound's rejection of said offer occurred pre-petition on May 22, 1990. Once Greyhound had rejected this offer it was no longer a valid offer and in effect no longer existed. The Union implicitly acknowledged the fact that the offer made on May 22, 1990 was no longer a valid offer when it made an identical offer on June 26, 1990. Should Greyhound's rejection of the Union's offer to return to work constitute an actionable violation of the NLRA, all damages will accrue from May 22, 1990, forward. While Greyhound may terminate the accrual of damages by extending an offer to striking employees to return to work under the terms of the original collective bargaining agreement, Union employees will not be bound to return to work unless said offer is accepted.

The NLRB argued before the bankruptcy court that Greyhound's failure to reinstate striking employees constituted a continuing actionable violation of the NLRA which in turn gave rise to a post-petition unfair labor practice pursuant to Greyhound's refusal to reinstate striking employees subsequent to June 4, 1990. The bankruptcy court ruled that "[i]t is inconsistent with [section 10(b) of the Labor Relations Act] to argue that a failure to reinstate each day after the initial failure constitutes a new violation." [15]

On appeal the NLRB argues that the bankruptcy court misconstrued the meaning and applicability of Section 10(b). The NLRB further states that it is not their position "that more than six months after an unlawful discharge or refusal to reinstate, the concept of continuing constructive wages due an employee can serve to nullify section 10(b) or *authorize the filing of an unfair labor practice charge.*" NLRB Brief p. 20 (emphasis supplied). Instead, the NLRB argues that "[w]hat is at issue here is not the date of refusal to reinstate the striker, but the dates on which the wages accrued...." *Id.*

This Court agrees with the NLRB that the concept of continuing constructive wages is an insufficient basis to authorize the filing of a claim for unfair labor practices. Logically, if Greyhound's refusal to reinstate Union employees post petition constituted a continuing actionable violation under the NLRA then the six month limitation period pursuant to Title 29 U.S.C. § 160(b) would never begin to run. As such, this Court is of the opinion that the NLRB back pay claim is founded upon pre-petition events[16].

The events giving rise to any potential unfair labor practices liability on the part of Greyhound all occurred prior to Greyhound's filing for bankruptcy protection. Despite the fact that the damages arising from the alleged unfair labor practices continue to accrue post-petition, the claim itself arises from Greyhound's pre-petition conduct and as such is a pre-petition claim. The mere fact that the alleged damages

---

**14.** On June 26, 1990, the Union reiterated this offer, which Greyhound rejected.

**15.** Section 10(b) is a statute of limitations which provides "[t]hat no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board ..."

**16.** Including Greyhound's alleged failure to bargain to impasse, Greyhound's alleged failure to bargain in good faith, or Greyhound's rejection of the striking employees offer on May 22, 1990 to return to work.

continue to accrue post-petition does not alter the character of the claim itself.

■ Having found the alleged unfair labor practices to have occurred pre-petition this Court must further determine:

first, whether that portion of the back pay claim attributable to post-petition accrued liability falls within § 507(a)(1) pursuant to § 503(b)(1)(A); and second, whether that portion of the back pay claim attributable to pre-petition liability falls within § 507(a)(3).

As noted by the Court previously, the bankruptcy court in its Classification Order addressed only that portion of the NLRB back pay claim accruing post-petition. Therefore, this Court, having already found the NLRB back pay claim to be a pre-petition claim, must merely determine whether that portion of the back pay claim attributable to Greyhound's potential post-petition liability falls within § 507(a)(1) pursuant to § 503(b)(1)(A). Stated more specifically, whether the NLRB back pay claim for post-petition accrued wages should be afforded administrative priority.

The NLRB argues that the Board's back pay claim is one for wages which have been "constructively" earned post-petition by the striking employees and other pre-petition discriminatees by virtue of their continued status under the Labor Act as an employee. As such it is argued that the back pay claim should be classified as any "[r]egular wage [claim] earned during Chapter 11 administration...." NLRB Brief pp. 13, 14. It is the NLRB's contention that the back pay claim should be construed as an "actual expense of doing business" and accordingly should be allowed as an administrative expense under 11 U.S.C. § 503(b)(1)(A) and entitled to priority under 11 U.S.C. § 507(a)(1). NLRB Brief pp. 13, 14.

In reviewing the arguments of all parties the Court looks to the legislative purpose behind the Bankruptcy Reform Act of 1978.

The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.... If the business can extend or reduce its debts, it often can be returned to a viable state. It is more economically efficient to reorganize than to liquidate, because it preserves jobs and assets....

When a petition is filed, all creditor actions against the debtor are stayed. The stay gives the debtor the opportunity to bring all of its creditors together for discussion, explanation of the debtor's financial problems, and negotiation. Creditors are prevented from acting unilaterally to gain an advantage over other creditors or to pressure the debtor into action.

Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, pp. 220–21 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 6179–81. As expressly stated above, the purpose behind Chapter 11 reorganization is to provide legal processes by which a failed business is provided with an opportunity to reorganize its financial affairs, thereby allowing the business to continue for the benefit of its creditors (both pre-petition and post-petition), *see United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983), its employees and its shareholders.

Realizing that a bankrupt business would need financial support Congress gave consideration to the fact that post-petition creditors would need both incentives and special protections in return for their willingness to provide financial backing to the failed entity. Accordingly, Congress provided that post-petition creditors would receive first priority status under §§ 503(b)(1)(A) and 507(a)(1).

Likewise, Congress realized that a business could not expect to operate without the time, effort and labor of a skilled work force. Therefore, Congress provided first priority status for "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered" post-petition. Bankruptcy Code § 503(b)(1)(A).

The NLRB's back pay claim is one for "constructive" wages which have accrued post-petition. Yet the NLRB seeks priority status commensurate with post-petition creditors as well as claims for wages, salaries and commissions arising from **actual** and **necessary** services rendered for the purpose of preserving the estate. Moreover, the NLRB and Union argue that said back pay claim should be afforded greater priority than claims for wages, salaries or commissions **earned** within 90 days of the filing of the petition or the date of the cessation of the debtor's business.[17]

The NLRB seeks recovery on behalf of Union employees for back pay claims arising from Greyhound's alleged unfair labor practices. The NLRA governs whether or not the NLRB has a valid claim. Accordingly, the NLRB argues that a ruling denying administrative priority to a NLRB back pay claim will diminish the purpose of the NLRA and render the back pay claim meaningless. This Court however, is of the opinion that the "policy of the National Labor Relations Act is fully served by recognizing the claim for back pay as one to be paid from the estate. The question whether it should be paid in preference to other creditors is a question to be answered from the Bankruptcy Act." *Nathanson v. NLRB*, 344 U.S. 25, 28–29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952).

█ This Court is of the opinion that "terms 'actual' and 'necessary' contained in 11 U.S.C. § 503(b)(1)(A) must be narrowly construed in order to keep administrative expenses at a minimum and thus preserve the estate for the benefit of all creditors." *In re Patch Graphics*, 58 B.R. 743, 745 (Bankr.W.D.Wis.1986). The NLRB back pay claim is for "constructive" wages and is neither an "actual" nor a "necessary" cost or expense of "preserving the [bankruptcy] estate."

Section 503 of the Bankruptcy Code sets forth specific expenses which are "includ[ed]" within the ambit of "administrative expense." While this Court agrees

that said enumeration is to be considered neither comprehensive nor exclusive, *In re Fireside Office Supply, Inc.*, 17 B.R. 43, 45 (Bankr.D.Minn.1981); Title 11 U.S.C. 102(3); this Court is of the opinion that to hold "constructive" wages are to be afforded administrative priority would require the Court to completely ignore the express Congressional directives that expenses afforded administrative priority be for "actual" and "necessary" wages, salaries or commissions.

█ In ruling on this issue this Court must look to and interpret those relevant sections of the Bankruptcy Code. If the language within the Code is unambiguous, in the absence of clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Having found the language of § 503 to be unambiguous "the plain words and meaning of the Bankruptcy Code must prevail. To do otherwise would impress upon innocent creditors a penalty by diminution of the Debtor's estate which was not contemplated by the Bankruptcy Code." *In re Wheeling–Pittsburgh Steel Corporation*, 113 B.R. 187 (Bankr.W.D.Pa.1990).

"There being no postpetition benefit to the estate and no postpetition conduct to justify the allowance of the back-pay award" as an administrative expense priority claim, *Id.* at 192, this Court is of the Opinion that the NLRB claim for post-petition back pay should be classified as a general unsecured debtor and that the bankruptcy court's Classification Order should be **AFFIRMED.**

## THE ESTIMATION HEARING AND THE ORDER CONFIRMING THE THIRD AMENDED PLAN OF REORGANIZATION

On April 4–5, 1991, the bankruptcy court conducted a hearing, thereby providing a full opportunity for the parties to argue

---

17. With regard to pre-petition unsecured wage claims third priority is given to those "wages, salaries, or commissions" earned within 90 days of the filing of the petition or the date of the cessation of the debtor's business. Bankruptcy Code § 507(a)(3)(A).

the substantive labor law issues and to present evidence on Greyhound's potential liability arising from the NLRB back pay claim. The bankruptcy court entered its oral ruling on May 14, 1991, wherein the court estimated the back pay claim at $31,-250,000. Pursuant to the court's ruling the Union appealed. The following issues are raised on appeal in Civil Action No. B–91–213.

1. Whether the bankruptcy court lacked jurisdiction or authority to estimate the National Labor Relations Board's back pay claim at an amount different than the Board's proof of claim.

2. Assuming arguendo that the bankruptcy court had jurisdiction, whether the bankruptcy court erred in the factors considered and in the manner and calculation of its estimate of the Board's back pay claim.

3. Whether the bankruptcy court erred when it confirmed a plan of reorganization that makes no provision for any payment or distribution on an NLRB award, for back pay and benefits, that exceeds the bankruptcy court's discounted estimate of $31.25 million.

■ The NLRB argues on appeal that the Board is a specialized forum created by Congress to adjudicate unfair labor practice complaints, and if violations are found, to liquidate the amounts owed as remedy. Specifically, the NLRB argues that the Board retains exclusive authority to determine remedies for unfair labor practice conduct, including the amount of back pay or other monetary relief. As such the NLRB contends that the bankruptcy court erred in its determination that it had jurisdiction to estimate the Board's claim at an amount other than that set forth in its amended proof of claim.

This Court agrees that the "fixing of [a] back pay (claim) is one of the functions confided solely to the Board." *Nathanson v. NLRB*, 344 U.S. 25, 29–30, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952). However, it is clear that Congress has vested the district court with original and exclusive jurisdiction over all bankruptcy cases, and with original and concurrent jurisdiction over "all civil pro-

ceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a) and (b). Pursuant to Title 28 U.S.C. § 157(a) it is equally undisputed that a district court may "provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."

This Court further acknowledges that Congress has expressly provided for contingent or unliquidated claims to be estimated. Title 11 U.S.C. § 502 expressly provides that:

(a) A claim or interest. . . . is deemed allowed. . . . unless a party in interest. . . . objects.

(b) . . . . if such objection to a claim is made, **the court,** after notice and a hearing, shall determine that amount of such claim in lawful currency of the United States. . . . and shall allow such claim in such amount. . . .

**(c) There shall be estimated for purpose of allowance under this section—**

**(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case;**

(emphasis supplied).

Pursuant to the alleged unfair labor practices of Greyhound, the NLRB, in November 1990, filed a proof of **unliquidated multiple claims** for wages, salaries or commissions totaling $85,676,023. On August 19, 1991, the Board filed an amended proof of **unliquidated multiple claims** totaling $142,415,241.

Greyhound's reorganization could not be effected without the NLRB's proof of claim being addressed. However, it is undisputed that a full adjudication of the claims would require several years of litigation. Therefore, in order to effectuate the intent of Congress and the purpose of Chapter 11, the bankruptcy court conducted a mini-trial in order to arrive at a fair yet expeditious estimation of the NLRB claim thereby enabling the illiquid and contingent claim to be converted to a dollar amount *strictly for*

*the purpose of the bankruptcy proceedings.*

In light of the factors confronting the bankruptcy court it is the opinion of this Court that § 502(c) of the Bankruptcy Code supports the conclusion that estimation in this case was essential to the Chapter 11 proceedings. The Court basis its conclusion upon the fact that the Board's claim is **contingent and unliquidated** and the estimation was essential to the prevention of **"undue delay"** to the administration of Greyhound's—the Debtor's—cases.

In arriving at its estimation the Court took into consideration:

"the likelihood of success on the merits of the case, the time and costs involved in the litigation of this particular case. The likelihood of compromise or settlement on the case, and the likelihood of compromise or settlement after a verdict in the case if there is one. The effect of the judgment on the debtor, and the debtor's ability to pay such a judgment, with the caveat that I am not attempting to suggest that the liability in this particular case depends on how much the debtor can pay, but merely what I'm suggesting is the realities of this case are that a substantial judgment could well terminate the debtor, and in effect cause the possible conversion of the case to Chapter 7 or the possibility of a conversion, or the possibility of the implementation of a liquidation plan under chapter 11, which could have a profound effect on any liability in this particular case, assuming that the debtor were broken up into pieces. It's difficult to know where the liability would go at that point."

(R. 128, Docket 2829, p. 7).

Pursuant to the bankruptcy court's Order to Estimate the NLRB claim each side was permitted seven hours to present evidence and testimony by affidavit of live witnesses and expert testimony. Each side was permitted time to cross examine the witnesses of the opposing side. Both sides were permitted to introduce into evidence documents, charts, summaries and other visual aids. (R. 49, Docket 2049). As such the bankruptcy court was favored with approximately 165 trial exhibits to assist the court in reaching an informed and just decision.

The bankruptcy court entered its ruling on May 14, 1991 wherein it estimated the NLRB claim at $31,250,000. It was not the intent of the bankruptcy court to usurp nor infringe upon the authority of the Board in litigating the ultimate validity nor value of the NLRB claim. Furthermore, the bankruptcy court's estimation does not serve as a cap to the administrative law judge's ultimate award, if any, for the NLRB claim. Judge Schmidt expressly stated within his oral ruling on May 14, 1991 "I am not attempting to decide what the administrative law judge is going to decide.... I am simply valuing,.... I am **estimating** the value of this claim." (R. 128, Docket 2829, p. 6) However, to hold that the bankruptcy court was precluded from estimating that claim at an amount different from the Board's proof of claim would be to hold that the express language of § 502(c) is meaningless and inapplicable to claims asserted by the Board. This Court is of the opinion that such an argument is not supported by the express language of § 502.

While the Bankruptcy Code and Rules do not set forth specific procedural guidelines for the estimation of claims, the case law within the Fifth Circuit has established that the bankruptcy court has broad discretion to fashion estimation procedures. In *Addison v. Langston (In re Brints Cotton Mktg., Inc.),* 737 F.2d 1338, 1341 (5th Cir.1984) the Fifth Circuit held that "[i]n estimating a claim, the bankruptcy court should use whatever method is best suited to the circumstances." Having reviewed the transcripts of the bankruptcy court's estimation hearing (R. 102, Docket 2546; R. 103, Docket 2547; R. 104, Docket 2548), the trial exhibits introduced at the estimation hearing, and the transcript of the court's oral ruling (R. 128, Docket 2829), this Court is of the opinion that the procedures and manner by which the bankruptcy court arrived at its estimation were both thorough and just and as such did not constitute an abuse of discretion. *Id.* 1341, *accord Bittner v. Borne Chemical Company, Inc.,* 691 F.2d 134, 136 (3d Cir.1982). Therefore, the bankruptcy court's Estimation Order is **AFFIRMED.**

It is argued that the bankruptcy court erred in confirming a plan of reorganization that makes no provision for any payment or distribution on an NLRB award in excess of the bankruptcy court's estimate. The bankruptcy court declined to rule on the effects of estimation in connection with confirmation and further declined to address those issues within its Confirmation Order. The administrative law judge has yet to enter a judgment concerning the NLRB claim. Not until such a ruling is entered will this Court nor the bankruptcy court know whether the administrative law judge's ultimate damage award, if any, exceeds the $31.25 million estimate. As such it was not an abuse of discretion for the bankruptcy court to decline adjudication of such issues. *See In re Suttles,* 819 F.2d 764, 765–66 (7th Cir.1987); *Stout v. Prussel,* 691 F.2d 859, 861 (9th Cir.1982). Those issues having not been addressed by the bankruptcy court are therefore, not ripe for appeal. Accordingly, the bankruptcy court's Order Confirming Third Amended Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code for Greyhound Lines, Inc. and its Affiliated Debtors is hereby **AFFIRMED.**

The Clerk of this Court shall send a copy of this Order to all parties involved in the above referenced civil actions.